**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INDIVIOR INC., INDIVIOR UK LIMITED, and MONOSOL RX, LLC, | ) | |
| Plaintiffs, | ) | C.A. No. 15-1016-RGA |
| v. | ) | |
| MYLAN TECHNOLOGIES INC., MYLAN PHARMACEUTICALS INC. and MYLAN N.V., | ) | |
| Defendants. | ) | |

# JOINT CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**


**I. INTRODUCTION ... 1**

**A. Plaintiffs' Introduction ... 1**

**B. Defendants' Introduction ... 1**

**II. AGREED UPON CONSTRUCTIONS ... 2**

**III. DISPUTED CONSTRUCTIONS OF TERMS NOT PREVIOUSLY CONSTRUED BY THE COURT ... 2**

**A. Term 1 – "polyethylene oxide" (Claims 1 and 10 of the '150 Patent) ... 2**

1. Plaintiffs' Opening Position ... 2

2. Defendants' Answering Position ... 3

3. Plaintiff's Reply Position ... 4

4. Defendants' Sur-Reply Position ... 6

**B. Term 2 – "naloxone" (Claims 15 and 17 of the '832 Patent) ... 8**

**C. Term 3 – "film dosage composition" (Claims 11 and 12 of the '832 Patent) ... 8**

1. Plaintiffs' Opening Position ... 8

2. Defendants' Answering Position ... 9

3. Plaintiffs' Reply Position ... 11

4. Defendants' Sur-Reply Position ... 13

**D. Term 4 – "AUC" (Claims 16 and 17 of the '832 Patent) ... 15**

1. Plaintiffs' Opening Position ... 15

2. Defendants' Answering Position ... 15

3. Plaintiffs' Reply Position ... 16

4. Defendants' Sur-Reply Position ... 18

**E. Term 5 – "further drying said visco-elastic film to form a self-supporting edible film having a substantially uniform distribution of said at least one active component" (Claim 1 of the '497 Patent) ... 18**

1. Plaintiff's Opening Position ... 18

2. Defendants' Answering Position ... 20

3. Plaintiffs' Reply Position ........................................................ 26

4. Defendants' Sur-Reply Position ........................................................ 29

**IV. DISPUTED CONSTRUCTIONS OF TERMS PREVIOUSLY ADDRESSED/CONSTRUED BY THE COURT ........................................................ 32**

**A. Terms 1 and 2 – "at least one water-soluble polymer component consisting of polyethylene oxide in combination with a hydrophilic cellulosic polymer; wherein: the water-soluble polymer component comprises greater than 75% polyethylene oxide and up to 25% hydrophilic cellulosic polymer" (Claim 1 of the '150 Patent) and "at least one water-soluble polymer component consisting of polyethylene oxide in combination with a hydrophilic cellulosic polymer; wherein: the water-soluble polymer component comprises the hydrophilic cellulosic polymer in a ratio of up to about 4:1 with the polyethylene oxide" (Claim 10 of the '150 Patent) ........................................................ 32**

1. Plaintiffs' Opening Position ........................................................ 32

2. Defendant's Answering Position ........................................................ 33

3. Plaintiffs' Reply Position ........................................................ 35

4. Defendants' Sur-Reply Position ........................................................ 37

**B. Term 3 – "provide a local pH" (Claims 15 and 17 of the '832 Patent) ........................................................ 38**

1. Plaintiff's Opening Position ........................................................ 38

2. Defendants' Answering Position ........................................................ 38

3. Plaintiffs' Reply Position ........................................................ 39

4. Defendants' Sur-Reply Position ........................................................ 39

**C. Term 4 – "about 3 to about 3.5" (Claims 1 and 9 of the '832 Patent) ........................................................ 40**

1. Plaintiffs' Opening Position ........................................................ 40

2. Defendant's Answering Position ........................................................ 40

3. Plaintiffs' Reply Position ........................................................ 40

4. Defendants' Sur-Reply Position ........................................................ 40

**D. Term 5 – "capable of being dried without loss of substantial uniformity" (Claims 1 and 62 of the '514 Patent) ........................................................ 40**

1. Plaintiffs' Opening Position ........................................................ 40

2. Defendants' Answering Position .......... 49

3. Plaintiffs' Reply Position .......... 52

4. Defendants' Sur-Reply Position .......... 58

**E. Term 6 – "to maintain said substantially uniform distribution of said at least one active by locking-in or substantially preventing migration of said at least one active" (Claim 1 of the '497 Patent) .......... 60**

1. Plaintiffs' Opening Position .......... 60

2. Defendants' Answering Position .......... 60

3. Plaintiffs' Reply Position .......... 62

4. Defendants' Sur-Reply Position .......... 62

**F. Term 7 – "drying" (Claim 1 of the '497 Patent) .......... 63**

1. Plaintiffs' Opening Position .......... 63

2. Defendants' Answering Position .......... 63

3. Plaintiffs' Reply Position .......... 65

4. Defendants' Sur-Reply Position .......... 65

**G. Term 8 – "rapidly" (Claim 1 of the '497 Patent) .......... 65**

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs v. Dey, L.P.*,
110 F. Supp. 2d 667 (N.D. Ill. 2000) ........................................ passim

*Arness v. Franks*,
138 F.2d 213 (C.C.P.A. 19 43) ........................................ 31

*Avid Tech., Inc. v. Harmonic, Inc.*,
812 F.3d 1040 (Fed. Cir. 2016) ........................................ 40

*Cordis Corp. v. Boston Scientific Corp.*,
658 F.3d 1347, 1356-67 (Fed. Cir. 2011) ........................................ 30, 31

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
243 F. Supp. 2d 31 (S.D.N.Y. 2003) ........................................ passim

*Enzo Biochem, Inc. v. Applera Corp.*,
780 F.3d 1149 (Fed. Cir. 2015) ........................................ 18, 60

*E-PassTechs., Inc. v. 3Com Corp.*,
343 F.3d 1364 (Fed. Cir. 2003) ........................................ 32

*FO2GO LLC v. Adobe Sys. Inc.*,
C.A. No. 15-89-RGA, 2016 U.S. Dist. LEXIS 22144 (D. Del. Feb. 24, 2016) ........................................ 39

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ........................................ 19, 28, 59

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
355 F.3d 1327 (Fed. Cir. 2004) ........................................ 20

*Halliburton Energy Servs, Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) ........................................ 16

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ........................................ 29

*Honeywell Int'l Inc. v. ICM Controls. Corp.*,
45 F. Supp. 3d 969 (D. Min. 2014) ........................................ 15

*Honeywell Int'l, Inc. v. ITT Indus, Inc.*,
452 F.3d 1312 (Fed. Cir. 2006) ........................................ 50, 64

*In re Mochel*,
470 F.2d 638 (C.C.P.A. 19 72) ........................................ 31

*In re Skvorecz*,
580 F.3d 1262 (Fed. Cir. 2009) ........................................ 9, 11

*Intellectual Ventures I LLC v. Canon Inc.*,
36 F. Supp. 3d 449, 464 (D. Del. 2014)........................................................................ 38

*Intellectual Ventures I, LLC v. Ricoh Ams. Corp.*,
Civ. No. 13-474, 2016 WL 93847 (D. Del. Jan. 7, 2016).................................................... 9, 11

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364, 1371 (Fed. Cir. 2014) ............................................................................ 15

*Inventio AG v. ThyssenKrupp Elevator Americas Corp.*,
No. 08-0874-RGA, 2014 WL 129799 (D. Del. Jan. 14, 2014)............................................... 36

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
327 F.3d 1364 (Fed. Cir. 2003) ...................................................................................... 20

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
302 F.3d 1352 (Fed. Cir. 2002) ...................................................................................... 36

*KX Indus., L.P. v. PUR Water Purification Prods.*,
108 F. Supp. 2d 380 (D. Del. 2000)........................................................................ 34, 48, 60, 63

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ........................................................................................ 20

*Light Transformation Techs. LLC v. Lighting Sci. Grp.*,
No. 2:12-cv-826, 2014 WL 3402125 (E.D. Tex. July 11, 2014)............................................. 15

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014)............................................................................... 9, 10, 12, 13

*Noah Sys., Inc. v. Intuit, Inc.*,
No. 6-cv-933, 2010 U.S. Dist. LEXIS 140308 (W.D. Penn. Dec. 17, 2010) .......................... 38

*Oatey Co. v. IPS Corp*,
514 F.3d 1271 (Fed. Cir. 2008) .................................................................................. 20, 33

*Openwave Sys., Inc. v. Apple Inc.*,
808 F.3d 509, 513-17 (Fed. Cir. 2015)...................................................................... 50, 64

*Ormco Corp. v. Align Tech., Inc.*,
498 F.3d 1307 (Fed. Cir. 2007) .................................................................................. 28, 29

*Parker-Hannifin Corp. v. Baldwin Filters, Inc.*,
No. 1:07-cv-1709, 2008 U.S. Dist. LEXIS 108152 (N.D. Ohio July 3, 2008)........................ 10

*Red Dob Mobile Shelters, LLC v. Kat Indus., Inc.*,
2015 U.S. Dist. LEXIS 54272, at *26–27 (N.D. Tex. Apr. 24, 2015).................................... 19

*Regents of Univ. of Cal. v. Dakocytomation Cal., lnc.*,
517 F.3d 1364 (Fed. Cir. 2008) ...................................................................................... 35

*Scriptgen Pharms., Inc. v. 3-Dimensional Pharms., Inc.*,
79 F. Supp. 2d 409 (D. Del. 1999)................................................................................... 38

*Seachange Int'l, Inc. v. C-Cor Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) .......... 18

*Smith v. ORBCOMM, Inc.*,
No. 2:14-cv-666, 2015 WL 5302815 (E.D. Tex. Sept. 10, 2015) .......... 10

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362, 1365 (Fed. Cir. 2012) .......... 15

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008) .......... 34

*TM Patents v. IBM Corp.*,
72 F. Supp. 2d 370 (S.D.N.Y. 1999) .......... passim

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) .......... 19, 40

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) .......... 20

*Yodlee, Inc. v. Plaid Techs., Inc.*,
2016 U.S. Dist. LEXIS 5603 (D. Del. 2016) .......... 35, 37

# I. INTRODUCTION

## A. Plaintiffs' Introduction

Plaintiffs Indivior Inc., Indivior UK Limited, and Monosol Rx, LLC ("Plaintiffs") respectfully submit this Opening Claim Construction Position pursuant to the Court's Scheduling Order entered February 9, 2016 in the above-captioned action (D.I. 38). The claim terms disputed between the parties come from three "Orange Book" patents (U.S. Patent Nos. 8,603,514 ("the '514 Patent"), 8,475,832 ("the '832 Patent"), and 8,017,150 ("the '150 Patent")) and one process patent (U.S. Patent No. 8,900,497 ("the '497 Patent")). This Court previously construed claim terms in these patents in the parallel cases C.A. No. 13-1674 (the "Par/Watson Litigation") and C.A. 14-1451 (the "Teva Litigation").

## B. Defendants' Introduction

Plaintiffs seek to re-hash old ground for several claim terms, including arguing the very same proposed constructions that the Court already considered and rejected. In the interest of judicial economy, Defendants Mylan Technologies Inc., Mylan Pharmaceuticals Inc., and Mylan N.V. (collectively, or "Defendants") believe that additional briefing is not necessary for these claim terms. Plaintiffs have had a full and fair opportunity to litigate their constructions and are estopped from re-arguing the constructions.

The parties also dispute five claim terms that the Court has not previously construed: "polyethylene oxide" (claims 1 and 10 of the '150 Patent), "film dosage composition" (claims 11 and 12 of the '832 Patent), "AUC" (claims 16 and 17 of the '832 Patent), "about 3 to about 3.5" (claims 1 and 9 of the '832 Patent), and "further drying said visco-elastic film to form a self-supporting edible film having a substantially uniform distribution of said at least one active component" (claim 1 of the '497 Patent). Defendants' constructions are based on intrinsic evidence, such as the claim language, specification, and the prosecution history, including

arguments made by the patentee during prosecution of the asserted patents. Accordingly, Defendants respectfully request that the Court adopt their claim construction proposals in full.

## II. AGREED UPON CONSTRUCTIONS

The parties agree, subject to the Court's adoption, that the following claim terms have the following proposed meanings:

| Patent | Term | Agreed-upon Construction |
|---|---|---|
| **the '832 patent:** claims 15 & 17 | "naloxone" | This term should have its plain and ordinary meaning. |
| **the '497 patent:** claim 1 | "rapidly" | This term should have its plain and ordinary meaning. |

## III. DISPUTED CONSTRUCTIONS OF TERMS NOT PREVIOUSLY CONSTRUED BY THE COURT

### A. Term 1 – "polyethylene oxide" (Claims 1 and 10 of the '150 Patent)

#### 1. Plaintiffs' Opening Position

The term "polyethylene oxide" (or "PEO," as it is referred to in the specification) should be given its plain and ordinary meaning. A person of ordinary skill would know that PEO is a *specific* type of water-soluble polymer, and is characterized by its chemical structure, which has the -$CH_2CH_2O$- repeating unit. Ex. 1, Tadokoro *et al.*, "Structural Studies on Polyethers, [-(CH2)m-0-]n. II Molecular Structure of Polyethylene Oxide," *Macromolecular Chemistry and Physics*, Vol. 73, Issue 1, 109–27, 111 (1964). The use of the term PEO in the '150 Patent is consistent with this plain and ordinary meaning. *See, e.g.*, '150 Patent, 15:47–49. Indeed, as this Court recognized in the Par/Watson Litigation, the '150 Patent lists specific grades of "PEO" available from the Dow chemical company. C.A. No. 13-1674, D.I. 446 at 51 (citing '150 Patent, 48:40–58, 50:15–18).

Defendants' proposed construction of "PEO" significantly and improperly broadens the

scope of the term. Under Defendants' construction, "PEO" is not limited to the named polymer, but rather may be ***any*** "water soluble polymer component" whatsoever, as long as that polymer component "does not include polyethylene glycol." But the claims and specification make clear that "PEO" is not a generic term for all water-soluble polymers. Claim 1 itself provides that the film product comprises "at least one water-soluble polymer component consisting of polyethylene oxide in combination with a hydrophilic cellulosic polymer." In other words, it ***distinguishes*** PEO from other water-soluble polymers.

**2. Defendants' Answering Position**

The plain and ordinary meaning of a term must be considered in the context of the invention. *See Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014). Plaintiffs' assertion that the plain and ordinary meaning of the term "polyethylene oxide" should apply does nothing to shed light on the scope of the term. It also ignores the plain language of the specification.

As Plaintiffs' concede, the specification of the '150 Patent distinguishes PEOs from other water-soluble polymers. That is precisely the point of Defendants' construction, which comports with both the specification and the patentee's intent. The inventors of the '150 Patent acted as their own lexicographer, drawing a clear distinction between polyethylene oxide ("PEO") and polyethylene glycol ("PEG"). *See Skinmedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1203 (Fed. Cir. 2013) (quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)). Specifically, the patentee defined "[s]pecific" examples of water soluble polymers in the specification:

> Specific examples of useful water soluble polymers include, but are not limited to, ***polyethylene oxide (PEO)***, pullulan, hydroxypropylmethyl cellulose (HPMC), hydroxyethyl cellulose (HPC), hydroxypropyl cellulose, polyvinyl pyrolidinone, carboxymethyl cellulose, polyvinyl alcohol, sodium aginate, ***polyethylene glycol***, xanthan gum, tragancanth gum, guar gum, acacia gum, arabic gum, polyacrlic acid, methyl-methacrylate copolymer, carboxyvinyl copolymers, starch, gelatin, and combinations thereof.

’150 Patent at 15:47-56 (emphases added).[1] By identifying PEO and PEG as separate and distinct examples of water soluble polymers, the patentee redefined a PEO as a water soluble polymer that excluded PEG. *Skinmedica, Inc.*, 727 F.3d at 1202 (“In sum, although the inventors never explicitly redefined three-dimensional cultures to exclude the use of beads, their implicit disclaimer of culturing with beads here was even ‘so clear that it equates to an explicit one.’”) (citation omitted); *see also Bell Atl. Network Servs., Inc. v. Covad Commc’ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (“[A] claim term may be clearly redefined without an explicit statement of redefinition . . . . In other words, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.”) (internal quotations and citations omitted).

Plaintiffs’ arguments that Defendants’ construction broadens the scope of the term are wrong in view of the patentee’s own description of the invention. Defendants’ construction is consistent with the intrinsic record and correctly accounts for the patentee’s distinction between PEO and PEG. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (“The claims, of course, do not stand alone. Rather, they are part of a fully integrated written instrument . . . . For that reason, claims must be read in view of the specification, of which they are a part . . . . Usually, it is dispositive . . . .”) (internal quotations and citations omitted).

**3. Plaintiff’s Reply Position**

Defendants sole argument for adopting their proposed construction is based on their allegation that “[t]he inventors of the ’150 Patent acted as their own lexicographer, drawing a

[1] Plaintiffs cite to the first part of this sentence (lines 47-49) in support of their plain and ordinary meaning construction and conveniently leave out the remainder of the sentence (lines 50-56) which includes PEG as a separate and distinct example of a water soluble polymer from PEO.

clear distinction between polyethylene oxide ("PEO") and polyethylene glycol ("PEG")." In support of this allegation, Defendants point to a single passage in the '150 Patent:

> Specific examples of useful water soluble polymers include, but are not limited to, ***polyethylene oxide (PEO)***, pullulan, hydroxypropylmethyl cellulose (HPMC), hydroxyethyl cellulose (HPC), hydroxypropyl cellulose, polyvinyl pyrolidinone, carboxymethyl cellulose, polyvinyl alcohol, sodium aginate, ***polyethylene glycol***, xanthan gum, tragancanth gum, guar gum, acacia gum, arabic gum, polyacrlic acid, methyl-methacrylate copolymer, carboxyvinyl copolymers, starch, gelatin, and combinations thereof.

'150 Patent at 15:47–56 (emphasis added by Defendants). According to Defendants, because the '150 Patent "identif[ied] PEO and PEG as separate and distinct examples of water soluble polymers, the patentee redefined a PEO as a water soluble polymer that excluded PEG."

Defendants are wrong for at least two reasons. First, as Plaintiffs pointed out in their opening position, the inventors certainly did not mean for the term "PEO" to encompass—and the specification cannot reasonably be read to suggest that it does encompass—any water soluble polymer other than PEG, as Defendants' construction would have it. Indeed, Defendants' broad construction for PEO is inconsistent with their interpretation of the list of "water soluble polymers," discussed in the preceding paragraph. For example, Defendants' construction of PEO would encompass "hydroxypropylmethyl cellulose (HPMC)" because HPMC is "a water soluble polymer that does not include polyethylene glycol." However, according to the logic Defendants use to argue that PEO is "separate and distinct" from PEG, PEO would also be "separate and distinct" from HPMC, because both are recited in the '150 Patent's list of acceptable water soluble polymers. *See* '150 Patent at 15:47–56.

Second, contrary to Defendants' allegations, the '150 Patent does not define PEO and PEG as "separate and distinct" from each other. In fact, examination of the other items in the list cited by Defendants makes clear that the inventors of the '150 Patent provided this list as exemplary of terms used by persons skilled in the art to refer to acceptable materials, even if

some might fall into multiple categories or even be synonymous with each other. For example, the cited list includes both "acacia gum" and "arabic gum," even though persons skilled in the art would know that these terms are equivalent.[2] Accordingly, it is improper for Defendants to ask this Court to assume that, simply because the terms PEO and PEG are included on the same list, the construction of one *must* exclude the other.

For at least these reasons, Plaintiffs submit that the term "polyethylene oxide" should be given its plain and ordinary meaning.

**4. Defendants' Sur-Reply Position**

Contrary to Plaintiffs' assertion, Defendants are not proposing a broad construction that would include ***any*** water soluble polymer component so long as it does not include PEG. Rather, Defendants included "a water soluble polymer" in their proposed construction to exclude the other types of polymers described in the '150 patent—specifically, water swellable, water insoluble, or combinations of one or more water soluble, water swellable, or water insoluble polymers. '150 patent at 15:44-46. Defendants' construction is limited to the named polymer—a PEO. And under Defendants' construction, the PEO is a water soluble polymer, as compared to a water swellable or water insoluble polymer.

Furthermore, while Defendants agree that the list of "useful water soluble polymers" in the '150 Patent includes acacia gum and arabic gum, Plaintiffs are simply wrong in stating that acacia gum and arabic gum are synonymous. The United Nations and World Health

[2] The United Nations and World Health Organization list both of these terms as synonyms for "Gum arabic." *See* Ex. 3, excerpt of "Compendium of Food Additive Specifications," FAO/WHO Expert Committee on Food Additives, June 1997. Similarly, the 2000–2001 Aldrich Catalog, a key source for chemical purchases by those of skill in the art, recognizes these terms as equivalent. *See* Ex. 4 at 1.

Organization—the very authority which Plaintiffs rely upon (Ex. 3)—acknowledges that arabic gum and acacia gum are not one and the same:

> In practice, therefore, and although most internationally traded gum arabic comes from *A. senegal*, the term "gum Arabic" cannot be taken as implying a particular botanical source. In a few cases, so-called gum arabic may not even have been collected from *Acacia* species, but may originate from *Combretum*, *Albizia* or some other genus. In the discussion which follows, the term "gum Arabic" will generally be used in the generic sense as any *Acacia* gum unless it is qualified by some other statement or the botanical source is specified.

*See* Ex. 5 at 11. This is the precise nuance that Defendants address with their proposed construction—in the context of the '150 patent, PEOs and PEGs are not synonymous.[3] *See, e.g.*, Ex. 6 at 3 ("The fundamental structures of PEG and PEO are the same, because both of them are the polymers of ethylene oxide. The polymer of ethylene oxide with the molecular weight above 20,000 g/mol is PEO and the one with molecular weight below 20,000 g/mol is PEG.").[4]

The patentee recognized the differences between PEOs and PEGs and identified them as separate and distinct water-soluble polymers. Accordingly, the patentee redefined a PEO as a water soluble polymer that excluded PEG. *Skinmedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1203 (Fed. Cir. 2013); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).[5]

---

[3] Notably, Plaintiffs fail to address the relevant discussion of the similarities and differences of PEOs and PEGs. Instead, Plaintiffs deflect and focus on arabic gum/acacia gum.

[4] *See also* Ex. 7 at 1 ("Unlike most polymer systems, poly(ethylene oxide) is commercially available in an extraordinary wide range of molecular weights from ethylene glycol, diethylene glycol . . . . The lower molecular weight members of the series with n up to about 150 are generally known as polyethylene glycols while the higher members are known as poly(ethylene oxide), polyoxyethylene, or polyoxirane. In this book, the term poly(ethylene oxide) will be taken to include polymers of all molecular weights unless only the lower members are being discussed, in which case the term polyethylene glycol will be used.").

[5] Plaintiffs do not deny or distinguish the holdings of these cases, which Defendants identified in their Answering Position.

### B. Term 2 – "naloxone" (Claims 15 and 17 of the '832 Patent)

There is no longer a dispute regarding this term. The parties agree that the term "naloxone" should be accorded its plain and ordinary meaning.

### C. Term 3 – "film dosage composition" (Claims 11 and 12 of the '832 Patent)

#### 1. Plaintiffs' Opening Position

The term "film dosage composition" should be given its plain and ordinary meaning. The '832 Patent extensively discusses its inventive "film dosage composition," *see*, *e.g.*, '832 Patent at Title ("Sublingual and Buccal ***Film Compositions***") (emphasis added), and contrasts it to the prior art tablet dosage forms:

> The present invention relates to methods of treating narcotic dependence in an individual. More desirably, the invention relates to the treatment of opioid dependence in an individual, while using a formulation and delivery that hinders misuse of the narcotic. Currently, treatment of opioid dependence is aided by administration of Suboxone®, which is an orally dissolvable tablet. This tablet which provides a combination of buprenorphine (an opioid agonist) and naloxone (an opioid antagonist). *Therefore, the present invention provides a method of treating narcotic dependence by providing an orally dissolvable film dosage*, which provides a bioequivalent effect to Suboxone®. The film dosage preferably provides buccal adhesion while it is in the user's mouth, rendering it difficult to remove after placement.

'832 Patent, 4:47–60 (emphasis added). Example 8 of the '832 Patent discloses the absorption characteristics of an inventive "film dosage composition" containing buprenorphine and naloxone as compared to a "Suboxone® one dose tablet." *Id.* at 21:33–22:67. The specification also indicates that its inventive "film dosage composition provides a bioequivalent result to a commercially available Suboxone® product." *Id.* at 13:53–55. Thus, the use of the term "film dosage composition" in the specification of the '832 Patent is consistent with its plain and ordinary meaning: a "composition" of certain ingredients in the "dosage" form of a "film."

A patent claim is indefinite only if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Defendants appear to argue that "film dosage composition" is indefinite because independent Claim 9 of the '832 Patent is directed to "[a] method of treating narcotic dependence of a user, comprising the steps of: a. providing ***a composition*** comprising [certain components]; and b. administering ***said composition*** to the oral cavity of a user" (emphasis added), whereas claims 11 and 12 of the '832 Patent depend from claim 9 and recite "[t]he method of claim 9, wherein ***said film dosage composition*** . . . ." (emphasis added). In other words, Defendants argue claims 11 and 12 are indefinite because they use the term "said film dosage composition" instead of "said composition" and therefore lack proper antecedent basis. However, the "'failure to provide explicit antecedent basis for terms does not always render a claim indefinite.'" *See In re Skvorecz*, 580 F.3d 1262, 1268–69 (Fed. Cir. 2009) (quoting MPEP § 2173.05(e)); *see also* MPEP § 2173.05(e) (Nov. 2015) (same); *see also Intellectual Ventures I, LLC v. Ricoh Ams. Corp.*, Civ. No. 13-474-SLR-SRF, 2016 WL 93847, at *3 (D. Del. Jan. 7, 2016) (finding "said regulator" was not indefinite, even though "regulator" did not otherwise appear in claim because the term "inform[ed] those skilled in the art about the scope of the invention with reasonable certainty"). Here, in light of the extensive discussion of film dosage compositions, "a person skilled in the field of the invention would understand the claim when viewed in the context of the specification." *In re Skvorecz*, 580 F.3d at 1268–69.

**2. Defendants' Answering Position**

The Patent Act requires a claim to "particularly point[t] out and distinctly claim[] the subject matter which the inventor [] regards as the invention." 35 U.S.C. § 112(b). The Supreme Court has held that a patent fails this requirement and is indefinite "if its claims, read in light of

the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

The term "said film dosage composition" as used in claims 11 and 12 of the '832 Patent must refer back to some film dosage composition recited earlier in the claims. Otherwise, the claim lacks antecedent basis and is indefinite. "A claim is indefinite when it contains words or phrases whose meaning is unclear. . . . A claim which refers to "said aluminum lever," but recites only "a lever" earlier in the claim, is indefinite because it is uncertain as to the lever to which reference is made." Manual of Patent Examining Procedure § 2173.05(e) (Nov. 2015) (citation omitted); *see Smith v. ORBCOMM, Inc.*, No. 2:14-cv-666, 2015 WL 5302815, at *12 (E.D. Tex. Sept. 10, 2015) (finding the term "said inputs to be controlled" was indefinite when a person of ordinary skill in the art would not have been able to discern the correct antecedent basis when considering the intrinsic evidence); *Parker-Hannifin Corp. v. Baldwin Filters, Inc.*, No. 1:07-cv-1709, 2008 U.S. Dist. LEXIS 108152, at *22-23 (N.D. Ohio July 3, 2008) ("[T]his Court finds that Claim 20 is indefinite under 35 U.S.C. § 112, second paragraph for lack of antecedent basis for the claim term 'said one of said first and second end caps.'").

Here, "said film dosage composition" does not refer back to some film dosage composition. Specifically, independent claim 9—from which claims 11 and 12 depend from—recites:

9. A method of treating narcotic dependence of a user, comprising the steps of:

a. providing ***a composition*** comprising:
   i. A polymeric carrier matrix;
   ii. A therapeutically effective amount of buprenorphine or a pharmaceutically acceptable salt thereof;
   iii. A therapeutically effective amount of naloxone or a pharmaceutically acceptable salt thereof; and

iv. A buffer in an amount to provide a local pH of about 3 to about 3.5 for ***said composition*** of a value sufficient to optimize absorption of said buprenorphine and also sufficient to inhibit absorption of said naloxone; and

b. administering ***said composition*** to the oral cavity of a user.

’832 Patent, cl. 9 (emphases added.) Claim 9 mentions “composition” three times. The use of the term “said film dosage composition” in claims 11 and 12 of the ’832 Patent—like the “said aluminum lever” example in section 2173.05(e)—is uncertain as to the composition to which reference is made. This ambiguity is further exacerbated by the patentee’s description of at least two different kinds of compositions in the specification—film-dosage compositions and film-forming compositions. ’832 Patent at 2:43-54. One of ordinary skill in the art would not understand with reasonable certainty what composition recited earlier in claim 9 is being referred to by the term “said film dosage composition.”

Plaintiffs’ reliance on *In re Skvorecz*, 580 F.3d 1262, 1268-69 (Fed. Cir. 2009) and *Intellectual Ventures I, LLC v. Ricoh Ams. Corp.*, C.A. No. 13-474-SLR, 2016 WL 93847, at *1 (D. Del. Jan. 7, 2016), is misplaced. In each of these instances, the claim terms under scrutiny—“at the separation” in *Skvorecz* and “said regulator” in *Intellectual Ventures I*—were introduced for the first time; there was no other “regulator” or separation” earlier in the claim. Unlike *Skorecz* and *Intellectual Ventures I*, claim 9—from which claims 11 and 12 depend—describes three separate instances of a “composition.”

### 3. Plaintiffs’ Reply Position

Defendants assert that this term is indefinite solely because it purportedly lacks antecedent basis: *i.e.*, independent Claim 9 does not expressly recite “a *film dosage* composition.” But it is clear that a term is not indefinite merely because it lacks antecedent basis. *See* Op. Position, *supra* (citing cases stating that a term is not automatically rendered indefinite if it lacks antecedent basis). Indeed, even the Manual of Patent Examining Procedure (“MPEP”)—

which *Defendants* rely upon—says in the sentence immediately below that quoted by Defendants that "the failure to provide explicit antecedent basis for terms does not always render a claim indefinite." MPEP § 2173.05(e). Rather, as the Supreme Court has held, a term is indefinite only if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

Here, Defendants do not even attempt to postulate any hypothetical where "said film dosage composition" recited in Claims 11 and 12 could refer to a composition other than "said composition" of Claim 9; indeed, any such hypothetical would be nonsensical. As Defendants correctly acknowledge, Claim 9 introduces "a composition" then refers back to "said composition" twice:

> 9. A method of treating narcotic dependence of a user, comprising the steps of:
> a. providing ***a composition*** comprising:
> i. A polymeric carrier matrix;
> ii. A therapeutically effective amount of buprenorphine or a pharmaceutically acceptable salt thereof;
> iii. A therapeutically effective amount of naloxone or a pharmaceutically acceptable salt thereof; and
> iv. A buffer in an amount to provide a local pH of about 3 to about 3.5 for ***said composition*** of a value sufficient to optimize absorption of said buprenorphine and also sufficient to inhibit absorption of said naloxone; and
> b. administering ***said composition*** to the oral cavity of a user.

Claims 11 and 12 add additional limitations to "[t]he method of claim 9," specifically referring to the composition recited in Claim 9 as "said film dosage composition."

Further, the language of the claims themselves makes clear that "said film dosage composition" recited in Claims 11 and 12 refers to "said composition" in Claim 9. For example, Claim 9 recites the step of "administering said composition to the oral cavity of the user" and

Claims 11 and 12 further recite that “said film dosage composition remains in the oral cavity of the user for a [certain] period.” A POSA would understand Claims 11 and 12 to require that the same composition that was deposited in the oral cavity of the user in Claim 9 must remain there for the time periods recited in Claims 11 and 12.

Finally, “film dosage composition” cannot be found indefinite without considering the claim in light of the specification, *see Nautilus*, 134 S. Ct. at 2124. As set forth in Plaintiffs’ opening position, the specification makes clear that “film dosage composition” should take its plain and ordinary meaning—i.e., a “composition” of certain ingredients in the “dosage” form of the film. *See, e.g.*, ’832 Patent at 13:53–55 (noting that the “film dosage composition provides a bioequivalent result to a commercially available Suboxone® [tablet] product”). Defendants wrongly suggest that the specification’s reference to a “film-forming composition,” ’832 Patent at 2:43–54, introduces ambiguity into the construction of the claim term “film dosage composition.” In fact, the specification explicitly states that said “film-forming composition” is simply the material that is cast to make the “film dosage composition,” *see id.*, making it impossible for any person—much less a POSA—to confuse one for the other.

Accordingly, because the scope of this term can be ascertained with reasonable certainty, it is not indefinite. *Nautilus*, 134 S. Ct. at 2124.TUFF

**4. Defendants’ Sur-Reply Position**

Plaintiffs mischaracterize Defendants’ Answering Position. Defendants do not argue that this term is indefinite ***solely*** because it lacks antecedent basis. Defendants assert that this term is indefinite because a person of ordinary skill in the art (“POSA”) would not understand with reasonable certainty what composition recited earlier in claim 9 is being referred to by the term “said film dosage composition.” Ans. Position at 9-11.

The term's ambiguity is exemplified by Plaintiffs' position that the three instances of "composition" refer to the same "film-dosage composition" of claims 11 and 12. Reply at 12. Plaintiffs' position contradicts the specification, which describes two different types of compositions—film-forming compositions and film dosage compositions:

> In still another embodiment of the invention, there is provided a process of forming ***a film dosage composition*** including the steps of: casting ***a film-forming composition***, the film-forming composition including: a polymeric carrier matrix; a therapeutically effective amount of buprenorphine or a pharmaceutically acceptable salt thereof, a therapeutically effective amount of naloxone or a pharmaceutically acceptable salt thereof, and a buffer in an amount to provide a pH of the composition of a value sufficient to optimize absorption of the buprenorphine and drying the ***film-forming composition*** to form a self-supporting ***film dosage composition***.

'832 patent at 2:43-54 (emphases added). According to the specification, the film-forming composition refers to the composition prior to drying, while the film-dosage composition refers to the self-supporting film composition after drying. Thus, a POSA would understand that in order to make a film dosage composition, there must first be a film-forming composition that is provided (or cast). Then, after drying, the film-forming composition would form the self-supporting film dosage composition. Claim 9 does not follow this line of thought. Instead, claim 9 refers to only one composition—*i.e.*, claim 9 does not differentiate between a film-forming composition and a film dosage composition. Accordingly, claims 11 and 12 are indefinite because a POSA would not understand with reasonable certainty what composition recited earlier in claim 9 is being referred to by the term "said film dosage composition."[6]

---

[6] Based on Plaintiffs' assertions in their Reply, it is Defendants' position that claim 9 is also indefinite for at least the same reasons—a POSA would not understand whether claim 9 is referring to one type or two types of compositions. Defendants intend to raise this issue at trial unless the Court prefers to simultaneously hear arguments on claims 9 and 11-12.

### D. Term 4 – "AUC" (Claims 16 and 17 of the '832 Patent)

#### 1. Plaintiffs' Opening Position

Plaintiffs' construction tracks the explicit definition of "AUC" provided by the '832 Patent: "As also used herein, the term AUC refers to ***the mean area under the plasma concentration time curve*** value after administration of the compositions formed herein." '832 Patent, 3:11–14 (emphasis added). Plaintiffs submit that this is the plain and ordinary meaning of this term to a person skilled in the art. In any event, because the specification "clearly set[s] forth a definition of the disputed claim term" this definition should control. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal quotation marks omitted).

#### 2. Defendants' Answering Position

The term "AUC" is indefinite because AUC can be evaluated at different time points, and a skilled artisan would not know what period of time to evaluate the AUC of buprenorphine and naloxone, as required by claims 16 and 17. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (indicating that there is an indefiniteness issue if the claim language "might mean several different things and 'no informed and confident choice is available among the contending definitions'") (quoting *Nautilus*, 134 S.Ct. at 2130); *see also Honeywell Int'l Inc. v. ICM Controls. Corp.*, 45 F. Supp. 3d 969, 985 (D. Min. 2014) ("Since the two options [for interpreting the claim] entail differing limitations for the claim, the missing langue in claim 1 results in lack of reasonable certainty as to its scope."); *Light Transformation Techs. LLC v. Lighting Sci. Grp.*, No. 2:12-cv-826, 2014 WL 3402125, at *9 (E.D. Tex. July 11, 2014) (finding the claims indefinite because the term "axis of light direction" was subject to multiple plausible constructions as there could be multiple centers of directed light). Indeed, the patentee included at least three different options for evaluating AUC in the specification: $AUC_{last}$ (*see, e.g.*, Tables 6-8), $AUC_{\infty}$ (*see, e.g.*, Tables 6-8), and AUC (normalized) (*see, e.g.*, Table 12).

Plaintiffs argue that an explicit definition of AUC in the specification—"the term AUC refers to the mean area under the plasma concentration time curve value after administration of the compositions formed herein" ('832 Patent, 3:11–14)—is sufficient to overcome an indefiniteness argument. That is wrong. "The fact that [the patentee] can articulate a definition supported by the specification . . . does not end the inquiry. Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningful precise claim scope." *Halliburton Energy Servs, Inc. v. M-I LLC*, 514 F.3D 1244, 1251 (Fed. Cir. 2008). Based on the claim language and specification, a skilled artisan would not know which AUC is claimed by claims 16 and 17. Accordingly, the term "AUC" is indefinite.

**3. Plaintiffs' Reply Position**

Defendants argue that this term is indefinite simply because the claims do not expressly specify a time period at which AUC is measured—i.e., Defendants allege the term could refer variously to $AUC_{last}$, $AUC_{\infty}$ (i.e., $AUC_{inf}$), or AUC (normalized). This argument, however, ignores the clear guidance provided by the specification of the '832 Patent. Specifically, while Defendants are correct that AUC can be evaluated at different time points, the '832 Patent makes clear that the specific AUC values referenced in Claims 16 and 17 refer to $AUC_{inf}$ values.

The inventors of the '832 Patent sought to develop a film that provided a bioequivalent effect to that of the commercially available Suboxone® Tablet. '832 Patent at 3:19–21, 3:48–56, 4:55–58. The inventors defined "bioequivalent" to mean "obtaining 80% to 125% of the Cmax and AUC values for a given active in a different product." *Id.* at 3:48–50. The specification explains that the "AUC value[] of buprenorphine for a commercially-available Suboxone® tablet (containing 2 mg of buprenorphine and 0.5 mg naloxone) . . . [is] 6.789 hr*ng/ml," and, therefore, "a bioequivalent product would have . . . an AUC value of buprenorphine of 5.431–

8.486 hr*ng/ml" (as 5.431 is 80% of 6.789, and 8.486 is 125% of 6.789). *Id.* at 3:50–56. Later in the specification, the inventors make clear that the 6.789 AUC value for the 2 mg buprenorphine (0.5 mg naloxone) Suboxone® tablet, rounded to 6.8, refers to $AUC_{inf}$:

> It has further been discovered that, by controlling the mean area under the curve (AUC) value of the film composition, a more effective dosage form may be provided. As is described in more detail in the Examples below, ***the inventive film composition preferably provides an AUC value so as to provide a bioequivalent result as that provided by the commercially available Suboxone® tablet***. In one embodiment, the film composition may include a mean ***AUCinf value of about 6.8 hr·ng/ml*** or greater.

*Id.* at 14:4–12.

In Table 2, the inventors repeat this AUC value (6.789), along with other AUC values, as follows:

| Dosage Form | AUC value of buprenorphine | AUC value of naloxone |
|---|---|---|
| 2 mg buprenorphine (0.5 mg naloxone) Suboxone® Tablet | 6.789 hr·ng/ml | 128.60 hr·ng/ml |
| 16 mg buprenorphine (4 mg naloxone) Suboxone® Tablet | 44.99 hr·ng/ml | 649.60 hr·ng/ml |

*Id.* at 16:55–63. Since the number 6.789 hr·ng/ml is known to be an $AUC_{inf}$ value, the other values shown in Table 2 must be $AUC_{inf}$ values as well.

The AUC values in claims 16 and 17 are derived from these $AUC_{inf}$ values in Table 2, based on what a bioequivalent range (80% to 125%) for those values would be. Thus, 5.431 and 56.238 in claim 16 are equal to 80% of 6.789 and 125% of 44.99, respectively; and 102.88 and 812.00 in claim 17 are equal to 80% of 128.60 and 125% of 649.6, respectively. Accordingly, a person skilled in the art, when considering the context provided by the specification, would know that the AUC values recited in Claims 16 and 17 refer to $AUC_{inf}$ values. Thus, these claims are not indefinite.

#### 4. Defendants' Sur-Reply Position

Again, Plaintiffs attempt to re-cast Defendants' position regarding this term. Defendants' position is that the claims are indefinite because AUC can be evaluated at different time points, and a POSA would not know at which time point to evaluate AUC.[7] Ans. Position, *supra*.

Plaintiffs import a time point of infinity for the AUC value into claims 16-17. Reply at 16-17. That is improper. *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1377 (Fed. Cir. 2005); *see also Enzo Biochem, Inc. v. Applera Corp.*, 780 F.3d 1149, 1154 (Fed. Cir. 2015) ("[T]he court must stay ever vigilant to avoid reading limitations from the specification into the claim.") (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)). There is simply no basis for importing this limitation, especially when the specification describes embodiments with AUC values for other time points. For example, the patentee provided $AUC_{last}$ and $AUC_{inf}$ values in Tables 10 and 11 for its film formulations with a local pH of 3-3.5—the precise local pH range claimed in independent claims 1 and 9. '832 Patent at 22:21-23, Tables 10-11. While the $AUC_{inf}$ value falls within the claimed limitations of claims 16-17, the $AUC_{last}$ value does as well. A POSA would not know which AUC time point is being claimed by claims 16-17. Accordingly, this term is indefinite

### E. Term 5 – "further drying said visco-elastic film to form a self-supporting edible film having a substantially uniform distribution of said at least one active component" (Claim 1 of the '497 Patent)

#### 1. Plaintiff's Opening Position

This term should be given its plain and ordinary meaning. Defendants ask instead that it be construed in a narrow and confusing manner. First, Defendants seek to define "further drying" as "a separate and distinct drying step." But they do not explain what would constitute a

[7] Plaintiffs even admit that AUC can be evaluated at different time points. Reply at 16.

"separate and distinct" step, or how that construction is mandated by the intrinsic evidence. Claim 1 simply provides for the formation of a visco-elastic film "within about the first 4.0 minutes" before "further drying": It says nothing about the "further drying" constituting a "separate and distinct" step. Further, it is unclear what additional separateness and distinctiveness Defendants' construction requires. The purpose of claim construction is "to clarify . . . what the patentee covered by the claims"—not to introduce ambiguity to an otherwise clear claim. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *see also Red Dob Mobile Shelters, LLC v. Kat Indus., Inc.*, 2015 U.S. Dist. LEXIS 54272, at *26–27 (N.D. Tex. Apr. 24, 2015) (refusing to adopt a party's proposed construction when "doing so could also introduce ambiguity and uncertainty into the claim language").

Second, Defendants' proposed construction improperly limits the claim by requiring that "the total drying time of both drying steps not exceed[] about 10 minutes"—a limitation not rooted in the claim language. Neither the specification nor the file history contain any "clear and unmistakable" disclaimer that would support adding these words to the claim. *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). The specification of the '497 Patent provides that "films of the present invention ***desirably*** are dried for 10 minutes or less," '497 Patent, 13:25–26 (emphasis added)—it does not *require* such a time limitation. Nor is there any basis in the specification's explanation of the inventors' insights in regard to producing a pharmaceutical film having the claimed uniformity or in the illustrative descriptions of how to carry out the invention that even suggest or logically imply that total drying time not exceed 10 minutes. As the person of ordinary skill would recognize, different formulations containing different ingredients and different proportions of water may take different amounts of time to dry to the desired state. Moreover, the specification expressly discloses "an example of the present

invention" in which a formulation was "dried at 90° C for about 11 minutes." '497 Patent, 40:38–40, 41:9–10. Under these circumstances, Defendants could not possibly show a "clear and unmistakable" disclaimer of drying times exceeding 10 minutes. Additionally, as the specification clearly describes drying ten minutes or less merely as *desirable*, Defendants are seeking to limit the claim to a preferred embodiment. But "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004); *see also Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1334 (Fed. Cir. 2004) (The recitation of a "highly desirable" feature in the specification does not limit the claims to that feature.); *Oatey Co. v. IPS Corp*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]here claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary."); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting proposed construction that would exclude disclosed examples in the specification); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003) (reversing claim construction ruling that excluded an embodiment described in an example in the specification, where the prosecution history showed no such disavowal of claim scope).

For at least these reasons, Defendants' proposed construction should be rejected.

### 2. Defendants' Answering Position

#### a. The "further drying" step is a separate and distinct drying step from the "rapidly evaporating" step

Claim 1 of the '497 Patent includes two drying steps that are separate and distinct from each other:

1.) "(c) rapidly evaporating at least a portion of said solvent upon initiation of drying to form a visco-elastic film within about the first 4.0 minutes to maintain said substantially uniform distribution of said at least one active by locking-in or substantially preventing migration of said at least one active within said visco-elastic film;" and

2.) "(d) further drying said visco-elastic film to form a self-supporting edible film having a substantially uniform distribution of said at least one active component . . . ."

'497 Patent at cl. 1. Plaintiffs argue that it is unclear how "***further*** drying said visco-elastic film to form a self-supporting edible film having a substantially uniform distribution of said at least one active component" is a separate and distinct drying step from the step of rapid evaporation. (Emphasis added.) However, the claim language and intrinsic record unambiguously demonstrate that the patentee intended to claim two different drying steps.

First, the patentee's placement of "further drying" in step (d) of claim 1—instead of step (c) in which the "rapidly evaporating" drying step is described—was deliberate and consequently telling. A person of ordinary skill in the art would understand that Plaintiffs desired to claim a separate and distinct drying step by describing separate steps: (1) rapidly drying to form a visco-elastic film and (2) further drying the visco-elastic film to form a self-supporting edible film. [8]

Furthermore, the specification repeatedly identifies two separate and distinct drying steps for forming the claimed films:

- "While the proper viscosity uniformity in mixture and stable suspension of particles, and casting method are important in the initial steps of forming the composition and film to promote uniformity, the method of drying the wet film is also important. Although these parameters and properties assist uniformity initially, ***a controlled rapid drying process*** ensures that the

[8] The Court acknowledged that Plaintiffs' claimed drying process includes more than one drying step. In its *Markman* opinion in the Teva Litigation, the Court noted: "I agree with Defendants that the mention of drying 'within ten minutes or fewer' in the specification relates only to the time it takes to dry the entire final film product, not the early step of forming the visco-elastic film." C.A. 14-1451, D.I. 175 at 13 n.3.

uniformity will be maintained until the film is dried. The wet film is ***then dried*** using controlled bottom drying or controlled microwave drying, desirably in the absence of external air currents or heat on the top (exposed) surface of the film . . . ." 10:51-61 (emphases added).

- "During the drying process of the present invention, several factors produce uniformity within the film while maintaining the active component at a safe temperature, i.e., below its degradation temperature. . . . Controlled bottom drying, as described herein, prevents the formation of a polymer film, or skin, on the top surface of the film. As heat is conducted from the film bottom upward, liquid carrier, e.g., water rises to the film surface. The absence of a surface skin permits rapid evaporation of the liquid carrier as the temperature increases, and thus, concurrent evaporative cooling of the film." 12:42-58 (emphases added).

- "Desirably, the film is dried from the bottom of the film to the top of the film. Desirably, substantially no air flow is present across the top of the film during its initial setting period, during which a solid, visco-elastic structure is formed. This can take place within the first few minutes, e.g. about the first 0.5 to about 4.0 minutes of the drying process. Controlling the drying in this manner, prevents the destruction and reformation of the film's top surface, which results from conventional drying methods. This is accomplished by forming the film and placing it on the top side of a surface having top and bottom sides. Then, heat is initially applied to the bottom side of the film to provide the necessary energy to evaporate or otherwise remove the liquid carrier." 27:28-40 (emphases added).

FIGS. 35 and 36 illustrate how these separate and distinct drying steps were employed:



FIG. 35



FIG. 36

The patentee explains in the specification:

"According to an embodiment of the zone drying apparatus **100,** shown in FIG. **35,** the film **110** may be fed onto the continuous belt **120,** which carries the film through the different drying zones. The first drying zone that the film travels through **101** may be a warm and humid zone. The second zone **102** may be hotter

> and drier, and the third zone **103** may also be hot and dry. These different zones may be continuous, or alternatively, they may be separated, as depicted by the zone drying apparatus **200** in FIG. **36**. The zone drying apparatus, in accordance with the present invention, is not limited to three drying zones. The film may travel through lesser or additional drying zones of varying heat and humidity levels, if desired, to produce the controlled drying effect of the present invention."

28:32-45 (emphases on original). *See also* FIG. 8 (identifying Sections A and B); Table 7 (identifying "First Heater Section (3 m)" and "Second Heater Section (3m)"); 13:38-61; 29:1-5. Simply put, the two separate and distinct drying steps of claim 1 are fully envisioned and described in the specification of the '497 Patent.

The prosecution history of related U.S. Patent No. 7,425,292 ("the '292 Patent") further supports Defendants' construction.[9] In response to an obviousness rejection, the patentee amended the claims, as detailed in the left column below:

| **Claim 91 of the '292 Patent** | **Claim 1 of the '497 Patent** |
|---|---|
| 91. (currently amended) A process for making a self-supporting, edible film having a substantially uniform distribution of components comprising:<br><br>a. mixing an edible water-soluble polymer component, water and an active component <u>comprising drug particles</u> to form an edible matrix with a compositionally uniform distribution of said components;<br><br>b. deaerating said matrix by mixing;<br><br>c. forming a wet film from said deaerated matrix <u>by coating or casting the film</u>;<br><br>d. providing a surface having top and bottom sides; | 1. A process for making a film having a substantially uniform distribution of components, comprising the steps of:<br><br>(a) forming a flowable polymer matrix comprising an edible polymer, a solvent and a desired amount of at least one active, said matrix having a substantially uniform distribution of said at least one active;<br><br>(b) casting said flowable polymer matrix;<br><br>(c) ***rapidly*** evaporating at least a portion of said solvent upon initiation of drying ***to form a visco-elastic film within about the first 4.0 minutes*** to maintain said substantially uniform distribution of said at least one active by locking-in or substantially preventing |

[9] The '497 Patent is a continuation in part of the '292 Patent. As in the '497 Patent, the '292 Patent similarly emphasizes, in its specification and prosecution history, the advantages of shorter drying times, i.e., less than about 10 minutes, in preparing the substantially uniform pharmaceutical films of the invention. '292 Patent at 7:41-50.

| Claim 91 of the ’292 Patent | Claim 1 of the ’497 Patent |
|---|---|
| e. feeding said film onto said top side of said surface; and<br><br>f. drying said film within about 10 minutes or fewer,<br><br>wherein said drying step further comprises:<br><br>(i) ***rapidly forming a visco-elastic film*** having said drug particles uniformly distributed throughout ***within about the first 4.0 minutes*** by applying hot air currents at temperatures of about 60°C to about 100°C to said bottom side of said surface with substantially no top air flow to prevent flow migration and intermolecular forces from creating aggregates or conglomerates of said drug particles thereby maintaining the compositional uniform distribution of components; and<br><br>~~(g)~~ (ii) ***further drying said visco-elastic film to form a self-supporting edible film*** having drug particles uniformly distributed throughout. | migration of said at least one active within said visco-elastic film;<br><br>(d) ***further drying said visco-elastic film to form a self-supporting edible film*** having a substantially uniform distribution of said at least one active component; and wherein said substantially uniform distribution of said at least one active component is measured by substantially equally sized individual unit doses which do not vary by more than 10% of said desired amount of said at least one active. |

Notably, the patentee claimed a similar film-forming process as described in claim 1 of the ’497 Patent, as noted above in the right column. Accompanying the ’292 Patent amendment, the patentee stated:

> The visco-elastic film is formed by applying hot air currents to the bottom side of the surface with substantially no top air flow. The hot air currents are applied at temperatures of about 60-100°C. This locks in the uniformity of components, including the drug particles, distributed uniformly throughout the film matrix. ***Then, the film is further dried***. As specified by the overall drying time, such drying time proceeds up to about 10 minutes. ***Therefore, the films are dried in a two-stage manner*** with initial drying requirements that lock in the uniformity of the components within the film, and then further drying to achieve the final self-supporting film product.
>
> None of the references disclose or suggest a ***two-stage drying process*** in which compositional uniformity is achieved in the ***first part*** and then maintained upon ***further drying*** until the final dried product is obtained. Nor are the specific drying times and temperatures for this ***two-stage process*** disclosed or suggested. Moreover, there would be no reason for one skilled in the art to modify the teachings of the cited art to attempt to achieve Applicants’ claimed process. There

> is simply no appreciation of the need for, or the problems faced in, achieving compositional uniformity in a film delivery system for drugs. In Zerbe, conventional air drying in an oven is used. Though Strobush discloses a more complex drying apparatus, there would be no reason for one skilled in the art to alter this apparatus in an attempt to achieve ***Applicants' two-stage drying process*** with its specific parameters.

D.I. 74, Jt. Ex. EE at 15-16 (emphases added).[10] Plaintiffs described the same disputed claim term as a two-stage drying process—*i.e.*, two separate and distinct drying steps. For this reason, the Court should adopt Defendants' construction which accounts for these separate and distinct drying steps. *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because [the] patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.").

**b. The total drying time of both drying steps does not exceed 10 minutes**

There is a "clear and unmistakable" disclaimer that requires the total drying time of both drying steps to not exceed 10 minutes. When amending claim 91 during the prosecution of the '292 Patent, patentee stated:

> [T]he amended claims require that the films undergo overall drying within about 10 minutes or fewer. As part of that overall drying process, a visco-elastic film having drug particles uniformly distributed throughout is initially created within about the first 4.0 minutes.

[10] The patentee presented similar arguments to the Patent Office in its subsequent amendment and responses. For example, in the May 11, 2006 Amendment and Response, patentee stated: "Applicant's current claims also contain the common step of 'forming a visco-elastic film', prior to the final drying step." D.I. 74, Jt. Ex. ZZ at 16. In the same amendment and response, patentee stated: "Bottom drying in Strobush cannot be separated from the multi-zoned and sub-zone heating areas which are required to slowly evaporate the solvent to leave behind surface aligned silver particles." *Id.* at 26.

D.I. 74, Jt. Ex. EE at 15. The patentee of the ’292 Patent indicated that the very similar drying process of claim 1 of the ’497 Patent had a total drying time that did not exceed 10 minutes. Accordingly, the Court should adopt Defendants’ construction. *See NTP*, 418 F.3d 1293.[11]

### 3. Plaintiffs’ Reply Position

#### a. Defendants’ “separate and distinct” requirement is confusing.

Plaintiffs do not dispute that Claim 1 of the ’497 Patent recites a sequence involving, first, “rapidly evaporating at least a portion of said solvent upon initiation of drying to form a visco-elastic film within about the first four minutes,” and subsequently, “further drying said visco-elastic film to form a self-supporting edible film.” Term 5, which describes the “further drying” that takes place after “form[ing] a visco-elastic film within about the first four minutes,” presents no interpretive challenges whatsoever and should thus be given its plain and ordinary meaning.

Defendants’ proposed construction, characterizing the latter drying as “a separate and distinct drying step,” confusingly seeks to introduce additional limitations not found in the plain language of the claims, making the claims less rather than more clear. Even though Plaintiffs pointed out in their Opening Position that “it is unclear what additional separateness and distinctiveness Defendants’ construction requires,” Defendants provided no answer in response. To the extent that Defendants mean to insinuate that “a separate and distinct drying step” must involve different drying *conditions* than the initial drying, however, they could not be more

[11] To refute Defendants’ construction, Plaintiffs cite to a single example in the specification where the film was dried in 11 minutes—*i.e.*, more than ten minutes. However, the patentee provides no indication in the specification that this example employed a two-stage drying process, as required by claim 1 of the ’497 Patent.

wrong. As the plain and ordinary language of the claims makes clear, there need be two stages or "steps" in the drying process only insofar as a change occurs in the film material itself—i.e., first it is dried to form a "visco-elastic film within about the first four minutes"; then it is "further dried." The additional drying after the formation of a visco-elastic film need not, however, involve any change in the drying conditions previously used, such as the temperature, airflow parameters, equipment settings, or zones.

The prosecution history of the '292 Patent amendment—to the extent it is relevant at all—is not to the contrary. Insofar as it describes two drying "stages," the statement cited by Defendants is consistent with the plain and ordinary language of Claim 1 of the '497 Patent—i.e., "the films are dried in a two stage manner with initial drying requirements that lock in the uniformity of the components within the film, and then further drying to achieve the final self-supporting film product." D.I. 74, Jt. Ex. EE at 15–16. Like Claim 1 of the '497 Patent, this passage describes the sequence of events in terms of what happens to the film itself: one drying stage forms a "visco-elastic film" that "lock[s] in the uniformity," *id.*, after which "further drying" occurs. In no way must these "stages" be "separate and distinct."

Nor do the descriptions of drying in the specification show a clear and unmistakable disclaimer that "further drying" must be "separate and distinct" in any sense other than what is clear from the claim language itself. While the portions of the specification and figures cited by Defendants disclose some embodiments meeting the drying limitations recited in Claim 1, such as multiple zone ovens with different drying parameters in different zones, *see* '497 Patent at 28:32–45, the invention recited in Claim 1 is not limited to these embodiments. *See* '497 Patent at 28:19–20 ("*Another* method of controlling the drying process involves a zone drying procedure."). In addition, nowhere does the description of zoned drying indicate that the different

oven zones must coincide with different "steps" as described in Claim 1(c) (initial drying) and Claim 1(d) ("further drying"). In other words, even in the optional zoned drying embodiment, a viscoelastic film could form, and "further drying" thus commence, in the middle of one of the drying zones, rather than at the very instant the film passes from one zone to another. The fact that optional drying zones need not correspond to the "steps" of Defendants' proposed construction is underscored by the fact that, while Defendants insist that "the patentee intended to claim two different drying steps," the illustrated ovens contain *three* drying zones, '497 Patent, Figs. 35, 36, and the patent makes clear that even more zones could be used. *See id.* at. 28:40–42. Defendants do not even attempt to identify which zone(s) correspond to each drying "step" in their construction.

**b. The patentee did not disclaim a drying time exceeding 10 minutes.**

In support of their construction, which limits the total drying time not to exceed 10 minutes, Defendants point only to an amendment during prosecution of the '292 Patent, which—unlike Claim 1 of the '497 Patent—expressly added a limitation to claim 91 of that patent of "drying said film within about 10 minutes or fewer." Although the prosecution history of a related patent can be relevant to claim construction, any disavowal of claim scope must be "clear and unmistakable." *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("The standard[] for finding . . . disavowal [is] exacting . . . disavowal requires that the specification [or prosecution history] make[] clear that the invention does not include a particular feature.") (quotations omitted, alterations in original). For example, in *Ormco Corp. v. Align Tech., Inc.*, the Federal Circuit found disclaimer from a statement made in a related application that was directed to "the present invention," "was not associated with particular language from

th[e] claims," and was consistent with disavowing statements in the specification of the patent. 498 F.3d 1307, 1315 (Fed. Cir. 2007).

Here, the inventors made no such "clear and unmistakable" disavowal of claim scope to the entire invention described in the specification of the '292 and '497 Patents. Unlike in *Ormco*, the statements accompanying the amendment in the '292 Patent were "associated with particular claim language." *See id*. Indeed, Defendants concede that the statements they rely on were directed to "the amended claims." D.I. 74, Jt. Ex. EE at 15 ("In particular, the amended claims require that the films undergo overall drying within about 10 minutes or fewer."). At no time did "the patentee make statements such as 'the present invention requires . . .' or 'the present invention is . . .' or 'all embodiments of the present invention are . . .'" when referring to a 10 minute drying time, such that it should limit the invention as a whole, especially one claimed in another patent. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014). Moreover, Defendants do not even attempt to corroborate this purported disavowal with statements in the specification of the '497 Patent, which, as pointed out in Plaintiffs' opening position, expressly contemplates embodiments with drying times greater than 10 minutes.

For these reasons, Defendants' proposed construction should be rejected and this term afforded its plain and ordinary meaning.

#### 4. Defendants' Sur-Reply Position

Defendants have modified their proposed construction for this term such that the previously proposed language "with the total drying time of both drying steps not exceeding about 10 minutes" is deleted from the proposed construction:

| **Defendants' Prior Construction** | **Defendants' Current Construction** |
|---|---|
| Further drying said visco-elastic film through a separate and distinct drying step to form a self-supporting edible film having a substantially uniform distribution of said at least one active component, with the total drying time of both drying steps not exceeding about 10 minutes | Further drying said visco-elastic film through a separate and distinct drying step to form a self-supporting edible film having a substantially uniform distribution of said at least one active component |

As detailed clearly in Defendants' Answering Position, Defendants' construction of a "two-stage drying process" is supported by the claim language and intrinsic evidence.[12] Ans. Position, *supra*.

Plaintiffs do not deny that claim 1 of the '497 patent can cover a process for making a film that involves two separate and distinct drying steps. Instead, Plaintiffs argue that there is no clear and unmistakable disclaimer that claim 1 of the '497 patent is limited to two separate and distinct drying steps. Plaintiffs are incorrect. The patentee clearly disclaimed a method of making a film with only one drying step by distinguishing similar claim language over the prior art during the prosecution of the '292 Patent.[13] *See Cordis Corp. v. Boston Scientific Corp.*, 658 F.3d 1347, 1356-67 (Fed. Cir. 2011) ("Claim terms must be construed in light of all of the intrinsic evidence, which includes not only the claim language and patent written description, but also the prosecution history.") (citation omitted).[14]

---

[12] Contrary to Plaintiffs' arguments, Defendants' construction does not require the formation of a visco-elastic film at termination of the first drying step. Furthermore, Defendants do not "insinuate" that the construction of "a separate and distinct drying step" must require different drying conditions. Defendants' construction simply requires two separate drying steps.

[13] Plaintiffs do not and cannot provide a reason why the prosecution history of the '292 patent does not apply to the similarly claimed drying process of claim 1 of the '497 patent.

[14] *See also Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007) ("When the application of prosecution disclaimer involves statements from prosecution of a familial patent

In *Cordis*, the patentee distinguished the claims in a parent application over the prior art. During subsequent litigation, the Federal Circuit affirmed the district court's narrow claim construction based on the patentee's disclaimer when it distinguished the claimed invention over the prior art. 658 F.3d at 1356-57. Similarly, the applicant of the '292 patent amended its claim with the same two-step drying process of claim 1 of the '497 patent and distinguished the drying methods of Yuki, Zerbe, and Strobush: "None of the references disclose or suggest a ***two-stage drying process*** in which compositional uniformity is achieved in the ***first part*** . . . until the final dried product is obtained. Nor are the ***specific drying times and temperatures*** for this ***two-stage process*** disclosed or suggested." D.I. 74, Jt. Ex. EE at 15 (emphases added); *see also* D.I. 74, Jt. Ex. ZZ at 16. The applicant's use of the plural form of drying times and temperatures to describe its two-stage process unambiguously indicates a method employing two different drying steps. Simply put, the patentee clearly disclaimed a single step drying method in distinguishing over prior art. Claim 1 of the '497 patent cannot cover a process of making a film with only one drying step.

---

relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant to construing the claims at issue.") (citation omitted).

# IV. DISPUTED CONSTRUCTIONS OF TERMS PREVIOUSLY ADDRESSED/CONSTRUED BY THE COURT

## A. Terms 1 and 2 – "at least one water-soluble polymer component consisting of polyethylene oxide in combination with a hydrophilic cellulosic polymer; wherein: the water-soluble polymer component comprises greater than 75% polyethylene oxide and up to 25% hydrophilic cellulosic polymer" (Claim 1 of the '150 Patent) and "at least one water-soluble polymer component consisting of polyethylene oxide in combination with a hydrophilic cellulosic polymer; wherein: the water-soluble polymer component comprises the hydrophilic cellulosic polymer in a ratio of up to about 4:1 with the polyethylene oxide" (Claim 10 of the '150 Patent)

### 1. Plaintiffs' Opening Position

As the Court recognized in the Teva Litigation, "[t]he sole dispute regarding [these terms] is whether the claims allow for a water-soluble polymer component that contains polyethylene oxide ('PEO') without any hydrophilic cellulosic polymer ('HCP')." C.A. 14-1541, D.I. 175 at 28–29. There, Plaintiffs cited to *In re Mochel*, 470 F.2d 638, 640 (C.C.P.A. 19 72) and *Arness v. Franks*, 138 F.2d 213, 216 (C.C.P.A. 19 43), in support of their position that these terms' use of the phrase "up to" includes 0% HCP as the lower limit. The Court agreed that "the phrase 'up to,' if used alone, could contemplate zero of the stated element," but stated "[t]he language in the claims, 'in combination,' makes clear that both [PEO and HCP] are required." C.A. 14-1541, D.I. 175 at 28–29. But this conclusion itself does not sufficiently appreciate the context provided by the phrase "up to." *E-PassTechs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1368 (Fed. Cir. 2003) ("When determining a claim term's ordinary meaning, we also look to the usage of the disputed claim term in context.").

This is demonstrated by a simple example. Replacing "greater than 75%" with "75% to 100%," and "up to 25%" with "0% to 25%," in the disputed term would yield the following modified term: "at least one water-soluble polymer component consisting of PEO in combination with HCP, wherein the water-soluble polymer component comprises 75% to 100% PEO and 0%

to 25% HCP." The modified term would plainly include embodiments with 100% PEO and 0% HCP. Moreover, pursuant to *Mochel* and *Arness*, the meaning of this modified term is identical to that of the disputed term. Thus, Claims 1 and 10 of the '150 Patent must also cover embodiments with 0% HCP.

Such a construction would also be consistent with the specification, which discloses specific embodiments without HCP. *See, e.g.*, '150 Patent, 50:6–34 ("The following examples of the present invention describe films that include PEO or PEO-HPC polymer blends."). Indeed, the '150 Patent expressly discloses that while "PEO desirably ranges from about 20% to about 100% by weight" "[HCP] ranges from about 0% to about 80% by weight, or in a ratio of up to about 4:1 with the PEO . . . ." *Id.* at 17:52–57. Thus, the Patent is clear that the invention includes embodiments where the PEO is "100%" of the polymer component and the HCP is "0%" of that component. As the claims may reasonably be read to include an embodiment that has 0% HCP, the claims should not be read to exclude that embodiment. *See, e.g.*, *Oatey*, 514 F.3d at 1277 ("[W]here claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.").

Plaintiffs' proposed construction should be adopted.

**2. Defendant's Answering Position**

The Court previously construed the disputed claim terms in the Teva Litigation. The Court's constructions, along with Plaintiffs' proposed constructions, are:

| Court's Construction | Plaintiffs' Proposed Construction |
|---|---|
| "at least one water-soluble polymer component consisting of polyethylene oxide in combination with a hydrophilic cellulosic polymer; wherein: the water-soluble polymer | This term means "at least one water-soluble polymer component consisting of polyethylene oxide ***and optionally*** hydrophilic cellulosic polymer, wherein **the** |

| Court's Construction | Plaintiffs' Proposed Construction |
|---|---|
| component comprises greater than 75% polyethylene oxide and up to 25% hydrophilic cellulosic polymer." C.A. 14-1451, D.I. 175 at 28. | **polyethylene oxide is an amount of greater than 75% of the polymer component and *there may be* up to 25% hydrophilic cellulosic polymer in the polymer component**." |
| "at least one water-soluble polymer component consisting of polyethylene oxide in combination with a hydrophilic cellulosic polymer; wherein: the water-soluble polymer component comprises the hydrophilic cellulosic polymer in a ratio of up to about 4:1 with the polyethylene oxide." C.A. 14-1451, D.I. 175 at 28. | This term means "at least one water-soluble polymer component consisting of polyethylene oxide ***and optionally*** hydrophilic cellulosic polymer, **wherein the ratio of hydrophilic cellulosic polymer to polyethylene *may be* up to 4:1**." |

Unhappy with the Court's prior construction, Plaintiffs attempt a second bite at the apple by asking the Court to reconsider the very same claim construction that it previously considered and rejected in the Teva Litigation. Plaintiffs' deviation from the Court's prior constructions are significant, as noted above.

Plaintiffs are precluded from advancing the same proposed construction that the Court previously rejected. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 243 F. Supp. 2d 31, 35 (S.D.N.Y. 2003), *aff'd by*, 363 F.3d 1263 (Fed. Cir. 2004) (holding that previous claim construction had preclusive effect upon the patent holder); *Abbott Labs v. Dey, L.P.*, 110 F. Supp. 2d 667, 669-71 (N.D. Ill. 2000) (holding that plaintiffs were barred from relitigating claim construction issues previously decided in an earlier infringement action); *TM Patents v. IBM Corp.*, 72 F. Supp. 2d 370, 379 (S.D.N.Y. 1999) (holding that earlier claim construction was binding on plaintiff when plaintiff had a full and fair opportunity to litigate the meaning of claims). *But cf. KX Indus., L.P. v. PUR Water Purification Prods.*, 108 F. Supp. 2d 380, 387 (D. Del. 2000) (holding that a defendant is not precluded from asserting claim construction

arguments when it was not a party to prior litigation in which the same claim term was not construed).

Even if the Court finds that Plaintiffs are not estopped from re-arguing the previously rejected construction, the Court should reject Plaintiffs' construction. For the reasons detailed in the Court's *Markman* Opinion in the Teva Litigation (C.A. 14-1451, D.I. 175 at 27-30), the Court should adopt its previous constructions. The Court correctly noted: "The language in the claims, 'in combination,' makes clear that both elements are required." C.A. 14-1451, D.I. 175 at 29. Even though the specification of the '150 Patent includes an embodiment that does not contain any hydrophilic cellulosic polymer, this embodiment does not warrant a rewriting of the claim language used by the patentee. *See, e.g.*, *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("[T]o construe the claim term to encompass the alternative embodiment in this case would contradict the language of the claims . . . . Our precedent is replete with examples of subject matter that is included in the specification, but is not claimed."). Accordingly, the Court should maintain its previous claim constructions.[15]

### 3. Plaintiffs' Reply Position

As Plaintiffs pointed out in their Opening Position, it is improper to consider one portion of the claim term—"in combination with"—in isolation, without also giving effect to the words "up to." When the words "up to 25%"—which mean simply "0% to 25%, as Plaintiffs noted—are also considered, it is clear that this term includes embodiments with and without HPMC. Defendants' Answering Position offers no response to this argument.

---

[15] For additional support, *see* Memorandum Opinion (C.A. 14-1451, D.I. 175 at 27-30), Defendants' Answering Position (C.A. 14-1451, D.I. 108 at 81-83), and Defendants' Sur-Reply Position (C.A. 14-1451, D.I. 108 at 86) from the Teva Litigation.

Rather, Defendant assert that "Plaintiffs are precluded from advancing the same proposed construction that the Court previously rejected [in the *Teva* case]." Defendants are mistaken, at the very least because there is as yet no final judgment in the *Teva* case. In the absence of a final judgment, claim construction is an interlocutory order and "subject to revision at any time before the entry of judgment." *See Regents of Univ. of Cal. v. Dakocytomation Cal., lnc.*, 517 F.3d 1364, 1371 (Fed. Cir. 2008); Fed. R. Civ. P. 54(b). Just this year, this Court also held that a party is not precluded from advancing a claim construction different than one adopted in an earlier case that has not reached a final judgment. *See Yodlee, Inc. v. Plaid Techs., Inc.*, 2016 U.S. Dist. LEXIS 5603, *6–9 (D. Del. 2016). As this Court acknowledged in *Yodlee*, "a district court may engage in 'rolling' claim construction, updating its constructions as the record develops," and the Court will have "the opportunity to update its construction if the case [] proceeds to trial." *Id.* at *8 (citations omitted); *see also Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) ("District courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding on the technology evolves."); *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, No. 08-0874-RGA, 2014 WL 129799, at *2 (D. Del. Jan. 14, 2014) (Andrews, J.) ("The Court sua sponte ordered the parties . . . to reargue various claim terms as a result of the Court becoming more familiar with the technology at issue in this case."); *id.* at *3–5 (adopting the plaintiff's construction in place of its original construction").

Defendants' reliance on *Dynacore*, *Abbott*, and *TM Patents* is misplaced, as each of those decisions found collateral estoppel based on cases with final claim construction decisions. *See Dynacore*, 243 F. Supp at 35–36 ("The Second Circuit affirmed the district court's grant of summary judgment of infringement, thus reaching a final determination on the merits."); *Abbott*,

110 F. Supp. at 670 ("[T]he judge's claim construction ruling was necessary to the final judgment in the case concerning infringement."); *TM Patents*, 72 F. Supp. at 376–77. By contrast, there has been no "final judgment" in the *Teva* case, which is set for trial in November 2016.

Accordingly, Plaintiffs are not precluded from advancing their proposed construction, and submit that their construction should be adopted for at least the reasons presented in their Opening Position.

#### 4. Defendants' Sur-Reply Position

This Court should adopt its previous construction for this term for the reasons detailed in this Court's *Markman* Opinion in the Teva Litigation. Ans. Position at 34-35. Contrary to Plaintiffs' arguments, this Court has previously considered the terms "up to" simultaneously with "in combination with" when construing this term: "I acknowledge that the phrase 'up to,' if used alone, could contemplate zero of the stated element, ***yet 'up to' must be read in light of the fact that the claims expressly require a combination of two statement elements: PEO and HCP***." C.A. 14-1451, D.I. 175 at 29-30 (emphasis added).[16] It is improper for Plaintiffs to re-argue what the Court has already considered and rejected.

Plaintiffs mistakenly rely on *Yodlee* for the proposition that collateral estoppel does not apply to a claim construction order where a final judgment has not been entered. As the court in

---

[16] The Court's holistic approach to the construction of this term is consistent with the construction argued by Teva (and adopted by this Court). *See, e.g.*, "Teva's construction considers the term as a whole, without reading out claim language. The 'up to' portion of the term provides an upper bound to the amount of HCP required, and the 'in combination with' provides the lower bound—that is, the amount of HCP that must exist in the formulation." C.A. 14-1451, D.I. 108 at 86. Defendants adopted the Court's *Markman* Opinion and Teva's briefing in their Answering Position. Ans. Position at 34-35.

*Yodlee* noted, "the preclusive effect of a prior district court's claim construction ruling depends on the specific facts of the case." *Yodlee, Inc. v. Plaid Techs., Inc.*, C.A. No. 14-1445-LPS, 2016 U.S. Dist. LEXIS 5603, at *7-8 (D. Del. Jan. 15, 2016). Notably, the court's decision to deny preclusive effect to a prior claim construction turned on the fact that many of the terms in dispute were different from those previously construed, recognizing that "collateral estoppel effect can be given to a claim construction order when an earlier court undertook an 'identical claim construction inquiry.'" *Id.* at *9 (citations omitted). Here, Plaintiffs' proposed claim construction is the same construction for the same claim term that this Court previously rejected in the Teva Litigation.[17]

**B. Term 3 – "provide a local pH" (Claims 15 and 17 of the '832 Patent)**

**1. Plaintiff's Opening Position**

As noted above, Plaintiffs do not believe the terms of the '832 Patent should be addressed here. If they were to be addressed, Plaintiffs do not seek further construction of this term. Nor do Plaintiffs believe this term is indefinite.

**2. Defendants' Answering Position**

In the Par/Watson Litigation, the Court found the term "local pH" indefinite because "the patent fails to provide persons of ordinary skill with information from which they could

---

[17] Furthermore, Plaintiffs mischaracterize how courts analyze the finality of a *Markman* decision. In *TM Patents, L.P. v. IBM Corp.*, the court gave collateral estoppel effect to a *Markman* decision emphasizing the need to promote uniformity. 72 F. Supp. 2d 370, 377 (S.D.N.Y. 1999). Plaintiffs' contention that the Teva Litigation has not reached a final judgment is misguided as, "it is inconceivable that a fully-litigated determination after a first *Markman* hearing would not be preclusive in subsequent actions involving the same disputed claims under the same patent. The nature of the *Markman* proceeding is such that finality is its aim." *Id*. Similarly, Plaintiffs should be collaterally estopped from advancing the same proposed construction that they advanced—and the Court rejected—in the Teva Litigation.

determine the 'local pH' of a formulation with reasonable certainty." C.A. 13-1674, D.I. 446 at 15. Accordingly, the Court found that claims 1, 3, and 6 were invalid.[18]

The same reasoning applies to claims 1-14, which also contain the term "local pH." *See Intellectual Ventures I LLC v. Canon Inc.*, 36 F. Supp. 3d 449, 464 (D. Del. 2014) (concluding that independent claims 1 and 26 were invalid for indefiniteness and dependent claims 7, 12, 28-30 were similarity invalid "as they each require the indefinite limitation of the independent claims"); *Noah Sys., Inc. v. Intuit, Inc.*, No. 6-cv-933, 2010 U.S. Dist. LEXIS 140308, at *9 (W.D. Penn. Dec. 17, 2010) ("[B]ecause a dependent claim effectively incorporates the limitations of the independent claim form which it depends, an indefinite limitation in an independent claim also invalidates all of that claim's dependent claims."); *Scriptgen Pharms., Inc. v. 3-Dimensional Pharms., Inc.*, 79 F. Supp. 2d 409, 421 (D. Del. 1999) ("[T]he court must interpret disputed terms consistently throughout the claims."); *see also FO2GO LLC v. Adobe Sys. Inc.*, C.A. No. 15-89-RGA, 2016 U.S. Dist. LEXIS 22144, at *7 (D. Del. Feb. 24, 2016) (holding claims were indefinite and invalid during claim construction).

**3. Plaintiffs' Reply Position**

As noted above, Plaintiffs do not believe the terms of the '832 Patent should be addressed here. If they were to be addressed, Plaintiffs do not seek further construction of this term. Nor do Plaintiffs believe this term is indefinite.

**4. Defendants' Sur-Reply Position**

As detailed above, the Court's prior determination that the term is indefinite should apply equally here. Ans. Position at 38-39.

---

[18] Claims 1, 3, and 6 of the '832 patent were the only claims asserted by Plaintiffs in the Par/Watson Litigation which included or incorporated "local pH." C.A. 13-1674, D.I. 446.

### C. Term 4 – "about 3 to about 3.5" (Claims 1 and 9 of the '832 Patent)

#### 1. Plaintiffs' Opening Position

Again, Plaintiffs do not believe the '832 Patent should be addressed here. Moreover, in the Teva Litigation, the Court declined to construe this term, stating that live testimony and cross examination would be beneficial, C.A. 14-1451, D.I. 175 at 27, and therefore Plaintiffs believe this term should not be addressed for that additional reason. (Plaintiffs' briefing on this point in the Teva Litigation, incorporated here, is at C.A. 14-1451, D.I. 108 at 67–78.)

#### 2. Defendant's Answering Position

In view of the Court's determination in the Teva Litigation that trial testimony is necessary concerning this claim term, Defendants do not believe this term should be addressed at this time. Defendants adopt the arguments raised by Teva in C.A. No. 14-1451 as set forth in the Joint Claim Construction Brief (D.I. 108).

#### 3. Plaintiffs' Reply Position

There is no longer a dispute ripe for the Court's consideration because Defendants now agree with Plaintiffs that this term should not be addressed at this time.

#### 4. Defendants' Sur-Reply Position

In view of the Court's determination in the Teva Litigation that trial testimony is necessary concerning this term, the parties agree that this term should not be addressed at this time.

### D. Term 5 – "capable of being dried without loss of substantial uniformity" (Claims 1 and 62 of the '514 Patent)

#### 1. Plaintiffs' Opening Position

In the Teva Litigation, the Court construed "dried" in the '514 Patent's claims to mean "dried without solely employing conventional convection air drying from the top." C.A. 14-

1541, D.I. 175 at 25.[19] Plaintiffs respectfully submit this construction gives rise to uncertainty, and should be revisited. For the reasons discussed previously in the Teva Litigation, the term "dried" should be given its plain and ordinary meaning. However, if the Court does not give "dried" its plain and ordinary meaning, the parties, their experts, and the Court would benefit from a clarification of the construction from the Teva Litigation, which has become the subject of dispute in that Litigation and will be here absent clarification. *See U.S. Surgical Corp.*, 103 F.3d at 1568 (purpose of claim construction is "to clarify . . . what the patentee covered by the claims"); *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1050 (Fed. Cir. 2016) ("[T]he aim of claim construction [is] to give the finder of fact an understandable interpretation of claim scope to apply to the accused systems.").

Based on the intrinsic evidence, the construction of the term "dried" should, at a minimum, be clarified so that "solely employing conventional convection air drying from the top"—a feature of the Court's construction—is interpreted to mean drying that (1) uses uncontrolled air currents, (2) occurs without heating from the bottom, and (3) was commonly employed in the field, and at the time, of the invention.

**a. "Conventional convection air drying from the top" refers to drying that uses *uncontrolled* air currents.**

The main objective of the '514 Patent is to provide orally dissolvable pharmaceutical films whose individual dosage units do not vary by more than 10% from the desired amount of the active ingredient. '514 Patent, 2:27–46; 4:27–42. The Patent explains that a number of different factors can affect content uniformity at various phases of the manufacturing process,

[19] Similarly, the Court construed the term "drying" in the '497 Patent—Term 7 below—to mean "drying without solely employing conventional convection air drying from the top" for substantially the same reasons. *Id.* at 17.

from mixing the ingredients, to casting the wet film matrix on a substrate, to drying the film before cutting it into individual dosage units. With respect to the drying process, in the "Background" section of the Patent, the inventors refer repeatedly to "conventional" film processing, and explain that "problems of particle self-aggregation and non-uniformity [are] inherent in conventional film forming techniques," *id.* at 2:50–62, and that "conventional drying methods themselves are unable to provide uniform films," *id.* at 3:14–16.

This understanding of "conventional" and "unconventional" drying, as set forth by the inventors and which formed the basis for the construction in the Teva Litigation, focuses on the importance of *controlled* air flow to maintain uniformity. Indeed, the '514 Patent indicates that "*[u]ncontrolled* air currents, either above or below the film, can create non-uniformity in the final film products." *Id.* at 22:65–67 (emphasis added); *see also id.* at 28:57–29:1 ("Conventional convection air drying from the top is not employed" but top air can be used as long as it does not "create a condition that would cause particle movement or a rippling effect in the film, both of which would result in non-uniformity."); *id.* at 29:14–15 ("top air flow cannot break, distort, or otherwise physically disturb the surface of the composition"); *id.* at 29:16–18 ("[A]ir velocities are desirably below the yield values of the film, *i.e.*, below any force level that can move the liquids in the film-forming compositions."). Thus, the Patent teaches that by carefully controlling airflow, one can avoid the problems associated with "conventional oven drying methods," such as the "rippling effect," where the top surface of the film repeatedly rips open and reforms. *Id.* at 22:41–58.[20]

[20] One example of how the '514 Patent distinguishes its drying techniques from those conventionally used before the invention is its treatment of zone drying and drying tunnels. While the Patent characterizes some drying tunnels as ineffective and conventional in its Background section, it also provides a "method of controlling the drying process [which]

In construing this term in the Teva Litigation, this Court relied on these and similar passages in the ’514 Patent. *See* C.A. 14-1541, D.I. 175 at 13–17, 24–25. However, while the Court read these passages—as well as a parallel passage in the prosecution history distinguishing Chen because it “does not disclose or even contemplate using *the specific controlled, bottom-drying methods presently claimed*,” *id.* at 24–25—as supporting limiting “dried” to “solely employing conventional convection air drying from the top,” it did not explicitly state that such conventional drying necessarily used *uncontrolled* air currents. Recognizing this point now will avoid unnecessary disputes about what must be shown to prove infringement.

**b. Drying that involves heating from the bottom does not “solely employ[] conventional convection air drying from the top,” regardless of the source of air flow.**

The Court construed “dried” as disavowing drying accomplished through “*solely* employing conventional convection air drying from the top.” C.A. 14-1541, D.I. 175 at 25. (emphasis added). Despite the clear meaning of the term “solely,” Defendants in the other pending cases have read the construction as excluding methods which employ heating from the bottom where the hot air used to heat from the bottom does not *originate* from the bottom. This gloss is inconsistent with the Court’s construction and the description of “conventional” drying

---

involves a zone drying procedure, employing an apparatus containing a drying tunnel having one or more drying zones and a continuous belt conveying the film through the drying zones.” *Id.* at 32:38–45. As the Patent makes clear, if the drying tunnel is used in a manner as taught in the Patent that *controls* the drying process to maintain uniformity by using drying zones and a continuous belt conveying the film through the drying zones—it “dries the film without surface skinning.” *Id.* at 32:46–50. Here, there is no mention of air or heat initially originating from above or below the film; rather, what is important is how drying is controlled to prevent particle migration, self-aggregation and non-uniformity. Thus, the overall point is to use these zones and the various drying settings they afford “to produce the controlled drying effect of the present invention.” *Id.* at 32:63–64.

techniques in the ’514 Patent. By clarifying the scope of the disavowal, the Court will avoid having to decide these issues during the trial phase of the litigation.

While the Patent teaches that drying the films from the bottom is “desirable” or “preferable,” *id.* at 30:46–47, nowhere does it state that only bottom-*sourced* air can be used for that purpose. This understanding is illustrated by Examples CG and CH. *Id.* at 51:65–53:35. Example CG first involves two films that were “dried according to *conventional* drying techniques, rather than the uniform drying process of the present invention.” *Id.* at 52:26–28 (emphasis added). “One film was dried in an oven at 80°C. for 9 minutes on a wire rack. The second film was dried in an oven at 80°C for 9 minutes on a wire screen.” *Id.* at 52:28–30. The resulting dried films showed imprints of the wire rack and screen. To the inventors, these results showed how the lack of uniform heat diffusion at these points of contact resulted in greater evaporation and greater particle density and thus aggregation at those contact points. *Id.* at 52:32–40. Two more films were then cast and dried using the same time and temperature conditions as the first two films, except that instead of being dried on a wire rack or screen, they were dried on a substrate that would uniformly distribute heat. Specifically, “the films were dried in an 80°C. air oven for 9 minutes on trays lined with furnace filters, which uniformly disperse heat.” *Id.* at 52:41–50. The inventors concluded that, “[d]ue to uniform heat diffusion throughout the film, no particle aggregation developed.” *Id.*. This example, which uses an “air oven,” does not involve any *direct* source of bottom air, but instead relies on heat transfer (or conduction) from the furnace filters upon which the film rests. A person of ordinary skill in the art would thus understand example CG to be an illustration of drying that is *nonconventional*.[21]

[21] The Patent explicitly states when air and heating are sourced from the bottom. *See, e.g., id.* at 47:54–55 (“The oven temperature was set at 90°C. to apply air and heat to the bottom only”);

Example CH is to similar effect. Three films were cast and then dried "for 9 minutes in an 80°C. air oven on trays lined with furnace filters, which uniformly distribute heat." These films did not exhibit particle aggregation. *Id.* at 52:54–65. Then, three more films were cast and were dried for the same amount of time and at the same temperature in an air oven, but "by conventional top and bottom drying means." *Id.* at 52:66–53:3. Just as in Example CG, the films dried on the wire rack and screen showed the imprints of the wire supports, evidencing "disuniformity in heat transfer which occurs in conventional top and bottom drying," and particle aggregation at those contact points. *Id.* at 53:8–20. Thus, the use of furnace filters is an example of a drying method encompassed by the claimed invention—*i.e.*, one that is not conventional—that uses bottom drying that is not bottom-sourced. In short, the Patent makes clear the it is not the direction of the air or drying that makes the method conventional, rather it is the way that method is utilized.

Nor does the prosecution history dictate a contrary result. Although the Court cited to the prosecution history of the '514 Patent in connection with its construction, the Court's construction does not require that bottom-sourced air be used during drying. Defendants' attempt to rely on that prosecution history in arguing non-infringement is therefore baseless. Regardless, the statement in the prosecution history did not refer to the claims that eventually issued in the '514 Patent, but instead referred expressly to the pending "method claims" (*i.e.*, claims 25–33). *See* C.A. 14-1451, D.I. 175 at 24–25 ("Chen, however, does not disclose or even contemplate using *the specific controlled, bottom-drying methods presently claimed*.") (quoting D.I. 91-6 at

---

22:30–35 ("Examples of controlled drying processes include, but are not limited to, hot air impingement across the bottom substrate and bottom heating plates."); 22:49–51 ("[A] uniform film is provided by drying the bottom surface of the film first or otherwise preventing the formation of polymer film formation (skin)."); *see also id.* at 45:1–50 (Table 7 and accompanying text specifying "bottom" and "top" air).

18–19) (emphasis added). This statement facially does not apply (and certainly does not clearly and unmistakably apply) to the ***composition claims*** that ultimately issued in the ’514 Patent and which do not recite “bottom-drying.” Instead, this statement is properly understood to be directed to ***method claims*** that were then pending in the application, which expressly recited specific “controlled” and “bottom-drying” method steps. For example, then pending Claim 26 was directed to a “***method*** of preparing a thin film drug delivery vehicle comprising . . . controllably drying.” C.A. 14-1541, D.I. 91-6 at 7. And then pending Claim 29 was directed to a “***method*** of preparing a thin film drug delivery vehicle . . . comprising . . . applying hot air currents to the bottom side of the wet film.” *Id*. at 7–8. Although the method claims had been withdrawn, in response to a restriction requirement, when the quoted statement about Chen was made, the claims were nevertheless still pending (as is clear from the face of the Examiner’s December 9, 2010 Office Action Summary), and it is common for a patentee to continue to make arguments directed toward non-elected, *i.e*., withdrawn, claims to support an argument later during prosecution that the claims subject to a restriction requirement should be “rejoined” to the other pending claims and found to be patentable. *See* Manual of Patent Examining Procedure § 821.04; *see also id.* § 821.04(b) (“[I]f applicant elects a claim(s) directed to a product which is subsequently found allowable, withdrawn process claims which depend from or otherwise require all the limitations of an allowable product claim will be considered for rejoinder. . . . Upon rejoinder of claims directed to a previously nonelected process invention, the restriction requirement between the elected product and rejoined process(es) will be withdrawn.”). Therefore, this statement cannot constitute an “unmistakable” disclaimer.[22]

---

[22] Further, the statements from the prosecution history quoted above further support Plaintiffs’ position that, as used in the ’514 Patent, “conventional” drying techniques refer to those that

**c. "Conventional convection air drying from the top" refers to drying that was commonly employed in the field, and at the time, of the invention.**

Lastly, Plaintiffs ask that the Court recognize that by describing certain drying methods as "conventional," the '514 Patent was using that term in its ordinary sense: as one that was commonly used at the time of the invention and in the field of the invention (*i.e.*, pharmaceutical film). In the other pending litigations, Defendants have attempted to show that certain drying methods are conventional by showing, *inter alia*, that they are disclosed in the prior art. Defendants also have argued that *all* methods that used top sourced air are conventional, even though the Court's claim construction in the Teva Litigation carefully construed the term "dried" as disavowing only *conventional* convection top drying, not all top-only drying. Similar attempts to make an end-run around the claim construction can be prevented in this case by adopting the clarification sought.

First, whether a method is conventional does not depend upon whether the equipment itself was commonplace. Rather, what is important is whether the drying method was commonly and regularly used—in other words, whether its use had become a *convention*. And as the Patent is directed to pharmaceutical film and the prior art discussed is that involving pharmaceutical film, the use of the word "conventional" clearly refers to conventional use in the field of the invention.

Second, the Patent is clear that the direction of the air flow does not dictate whether a method is conventional or not. *See* '514 Patent, 22:65–67 ("Uncontrolled air currents, ***either***

---

employ "uncontrolled" air currents, which can lead to non-uniform films. C.A. 14-1541, D.I. 91-6 at 18–19 ("The only means of drying disclosed in the cited references is ***the method of drying that the present application specifically seeks to avoid (uncontrolled air drying)***.") (emphasis added).

***above or below the film***, can create non-uniformity in the final film products." (emphasis added)). Thus, when referring to the disuniformity associated with the "conventional" drying processes employed before the claimed invention, the Patent states that "[t]hese complications "are avoided by the present invention, and a uniform film is provided by drying the bottom surface of the film first or ***otherwise preventing*** the formation of polymer film formation (skin) on the top surface of the film prior to drying to the depth of the film." *Id.* at 22:48–52 (emphasis added); *id.* at 28:57–29:1 ("Conventional convection air drying from the top is not employed" but convection top air *can* be used as long as it does not "create a condition that would cause particle movement or a rippling effect in the film, both of which would result in non-uniformity"); *see also id.* at 29:14–15 ("top air flow cannot break, distort, or otherwise physically disturb the surface of the composition"). The implication is clear: employing unconventional top drying will take the drying method outside of the disavowal—even where there is no bottom drying.[23]

* * *

For all these reasons, Plaintiffs ask that the construction of dried from the Teva Litigation be revisited. The alleged disavowal is neither clear nor unmistakable. But in any event, it ought to be clarified to eliminate unnecessary litigation about its meaning—with "conventional convection air drying from the top" specified to refer to drying that (1) uses uncontrolled air

[23] Of similar import is the Patent's discussion of zone drying. Without mentioning the initial direction of air or heat, the Patent indicates that one unconventional method "involves a zone drying procedure, employing an apparatus containing a drying tunnel having one or more drying zones and a continuous belt conveying the film through the drying zones." *Id.* at 32:38–45.

currents, (2) occurs without heating from the bottom, and (3) was commonly employed in the field, and at the time, of the invention.

### 2. Defendants' Answering Position

Plaintiffs' proposed construction of plain and ordinary meaning should sound familiar to the Court. It is the same construction that was previously considered and rejected by the Court in the Teva Litigation. C.A. 14-1451, D.I. 175 at 23. Plaintiffs' sole purpose is to have the Court repeat work that it has already done. There is no change in controlling law or new evidence since the Court's prior construction. Despite their unhappiness with the result, Plaintiffs had a full and fair opportunity to litigate their proposed construction in the Teva Litigation and are thus precluded from advancing the same proposed construction here *See Dynacore Holdings Corp.*, 243 F. Supp. 2d at 35; *Abbott Labs*, 110 F. Supp. 2d at 669-71; *TM Patents*, 72 F. Supp. 2d at 379. *But cf. KX Indus.*, 108 F. Supp. 2d at 387.

Even if the Court finds that Plaintiffs are not estopped from re-arguing the same claim construction they argued in the Teva Litigation, the Court should reject Plaintiffs' proposed construction. For the same reasons detailed in the Court's *Markman* Opinion in the Teva Litigation (C.A. 14-1451, D.I. 175 at 23-25), the Court should adopt its previous construction. The Court correctly noted: "[T]he patentee disavowed using solely convection air drying from the top, both through express statements of what the invention is and repeated disparagement of top drying methods." *Id.* at 15. For example, the patentee emphasized the importance of avoiding a ripple effect to maintain uniformity. '514 Patent at 3:14-16, 37-57. Furthermore, the patentee expressly disavowed using solely conventional convection air drying from the top:

> The wet film may be dried using controlled bottom drying or controlled microwave drying, desirably in the absence of external air currents or heat on the top (exposed) surface **48** (see FIG. **6**). Controlled bottom drying or controlled microwave drying advantageously allows for vapor release from the film without the disadvantages of the prior art. ***Conventional convection air drying from the***

> ***top is not employed*** because it initiates drying at the top uppermost portion of the film, thereby forming a barrier against fluid flow, such as the evaporative vapors, and thermal flow, such as the thermal energy for drying. Such dried upper portions serve as a barrier to further vapor release as the portions beneath are dried, which results in non-uniform films.

’514 Patent at 28:52-64 (emphasis added); *see also* 28:64-29:6. Additionally, the patentee made repeated statements in the specifications detailing the advantages of bottom drying over top drying and disadvantages of using conventional convection air drying from the top. *Id.* at 22:41-57; 29:30-34; 30:46-49.

The prosecution history further supports the patentee’s disavowal of conventional convection air drying. To overcome an obviousness objection in view of Chen, the patentee distinguished Chen and explained to the Patent Office:

> As further evidence that Chen completely fails to appreciate uniformity, Chen merely disclosed conventional hot air oven drying. . . . Chen, however, does not disclose or even contemplate using ***the specific controlled, bottom-drying methods presently claimed***. The only means of drying disclosed in the cited reference is the method of drying that the present application specifically seeks to avoid (uncontrolled air drying).

D.I. 74, Jt. Ex. K at 17-18 (emphasis added).

The patentee’s “repeated derogatory statements” of conventional convection air drying from the top clearly indicate a disavowal. *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513-17 (Fed. Cir. 2015); *Honeywell Int’l, Inc. v. ITT Indus, Inc.*, 452 F.3d 1312, 1320 (Fed. Cir. 2006) (“[R]epeated derogatory statements concerning one type of [feature can be] the equivalent of disavowal of that subject matter from the scope of the patent’s claims.”). Accordingly, the Court should maintain its previous claim construction.”[24]

---

[24] For additional support, see Memorandum Opinion (C.A. 14-1451, D.I. 175 at 23-25), Defendants’ Answering Position (C.A. 14-1451, D.I. 108 at 63-65), and Defendants’ Sur-Reply Position (C.A. 14-1451, D.I. 108 at 66) from the Teva Litigation.

Plaintiffs argue that the Court's prior construction requires clarification to resolve purported ambiguity. That is not true. First, the Court's prior construction is clear, despite Plaintiffs' transparent attempt to insert an air of ambiguity. Second, there is no support in the intrinsic evidence for the requested clarification. Thus, Plaintiffs' request should be rejected.

For example, Plaintiffs propose that "conventional convection air drying from the top" should refer to drying that uses *uncontrolled* air currents. This proposed construction lacks support. In the '514 Patent, the patentee described conventional drying methods: "Conventional drying methods generally include the use of forced hot air using a drying oven, drying tunnel, and the like." '514 Patent at 3:33-34. Furthermore, in distinguishing conventional air drying methods from the top, the patentee did not exclude controlled air drying from the top. *See, e.g.*, '514 Patent at 28:52-55 ("The wet film may be dried using controlled bottom drying or controlled microwave drying, desirably in the absence of external air currents or heat on the top (exposed) surface of the film **48** (see FIG. **6**).") (emphasis in original). Simply put, the patentee distinguished its invention from conventional air drying methods from top—which included both controlled and uncontrolled air currents. Accordingly, this Court's construction of "drying" is proper and no clarification is necessary.

Plaintiffs also propose that drying that employs heating from the bottom, regardless of the source of air flow, does not fall within this Court's construction of "solely employing conventional air drying from the top." This argument also lacks support in the intrinsic record. Presumably unable to meet their burden of proof regarding infringement of the '514 Patent in the Teva Litigation, Plaintiffs seek assistance from the Court under the guise of a so-called clarification. In the '514 Patent, the patentee described conventional air drying methods where heat originated from the top but dried both the top and bottom surfaces of the film:

> Conventional convection air drying from the top is not employed because it initiates drying at the top uppermost portion of the film, thereby forming a barrier against fluid flow, such as the evaporative vapors, and thermal flow, such as the thermal energy for drying. ***Such dried upper portions serve as a barrier to further vapor release as the portions beneath are dried***, which results in non-uniform films.

’514 Patent at 28:57-64 (emphasis added). The patentee clearly disavowed conventional air drying methods which employ hot air solely from the top that heated both the top and bottom surfaces of the film.

Finally, this Court should reject Plaintiffs’ attempt to clarify “conventional convection air drying from the top” to refer to “drying that was commonly employed in the field, and at the time, of the invention.” As discussed above, the Court’s construction is abundantly clear. Plaintiffs’ so-called clarification in fact introduces uncertainty and ambiguity into the term. Moreover, Plaintiffs provide no support—whether intrinsic or extrinsic—for such a construction. The Court previously relied on the intrinsic record to construe this term. There is no need to revisit that construction or to separately construe “conventional.”[25]

**3. Plaintiffs’ Reply Position**

As Plaintiffs have argued, the Court should give this term its plain and ordinary meaning, revisiting the construction given for this term in the ongoing *Teva* case. Contrary to Defendants’ assertion, Opp. at 15, the Court certainly has discretion to revisit its claim construction from the *Teva* case, and Plaintiffs are not precluded from urging the Court to do so, for the reasons set forth in Plaintiffs’ Reply Position on Terms 1 and 2 previously addressed by the Court, *supra*.

---

[25] Indeed, other courts have found that no construction was needed for the term “conventional.” *See, e.g.*, *ReedHycalog UK, Ltd. v. Baker Hughes Oilfield Operations, Inc.*, No. 6-cv-222, Dkt. No. 245, at 20 (E.D. Tex. Oct. 10, 2007) (construing “conventional rotary drag bit” as “[n]o construction required”).

The Court should exercise this discretion to give this term its plain and ordinary meaning, for the reasons Plaintiffs put forward in the *Teva* case. Defendants argue that the patentee "disavowed" using solely conventional convection air drying from the top. Yet, as Plaintiffs explained in the *Teva* case, the specification disparages convection top air drying only insofar as it is not controlled to prevent a rippling effect or otherwise cause a loss of uniformity. *See* C.A. No. 14-1451, D.I. 108 (Jt. Cl. Constr. Br.), at 44–46 , 62–63, 65. Defendants also allege that the discussion of Chen in the prosecution history shows a disavowal of conventional convection air drying. Yet Defendants simply ignore the fact that these statements about Chen related only to method claims that explicitly recited "controlled" and "bottom-drying" steps, and therefore show no such disavowal for the composition claims at issue here—as Plaintiffs have already explained.

Even if the Court chooses not to revisit its construction from the *Teva* case, the phrase "solely employing conventional convection air drying from the top" should at least be clarified to mean drying that (1) uses uncontrolled air currents, (2) occurs without heating from the bottom, and (3) was commonly employed in the field, and at the time, of the invention. The significant disputes between the parties and their experts over the Court's construction in the *Teva* case refute Defendants' assertion that "the Court's prior construction is clear." And, contrary to Defendants' assessment that "Plaintiffs provide no support—whether intrinsic or extrinsic—for such a construction," Plaintiffs discussed numerous examples from the intrinsic record to support each element of their proposed clarification. Op. Position, *supra*. Defendants' Answering Position simply ignores most of the evidence cited by Plaintiffs, basing its own cursory analysis on a selective misreading of other portions of the specification, as shown below. The Court's construction should therefore be clarified for the reasons set forth in Plaintiffs' Opening Position, as further explained below.

### a. Defendants ignore the evidence that "conventional convection air drying from the top" refers to drying with *uncontrolled* air currents.

Defendants argue that Plaintiffs' "proposed construction lacks support," insofar as Plaintiffs urge the Court to clarify that "conventional convection air drying from the top" entails the use of "uncontrolled air currents." To the contrary, Plaintiffs explained how this clarification is supported by numerous passages of the patent specification. Op. Position, *supra*; *see, e.g.*, '514 Patent, 22:58–62 ("[T]he bottom and top air flows are controlled to provide a uniform film. In such a case, the air flow directed at the top of the film should not create a condition which would cause movement of particles . . . ."), 22:64–67 ("Uncontrolled air currents, either above or below the film, can create non-uniformity in the final film products."), 28:57–29:1 ("Conventional convection air drying from the top is not employed" but top air can be used as long as it does not "create a condition that would cause particle movement or a rippling effect in the film, both of which would result in non-uniformity."), 29:14–15 ("top air flow cannot break, distort, or otherwise physically disturb the surface of the composition"), 29:16–18 ("[A]ir velocities are desirably below the yield values of the film, i.e., below any force level that can move the liquids in the film-forming compositions."). Rather than address this evidence, Defendants simply ignore it.

Instead, Defendants refer to two passages from the specification that neither refute the proposed clarification nor contradict the extensive evidence cited by Plaintiffs. First, Defendants observe that, according to the '514 Patent, "[c]onventional drying methods generally include the use of forced hot air using a drying oven, drying tunnel, and the like," '514 Patent at 3:33–34. This passage does not characterize all use of forced air as conventional. In fact, as shown above, the specification elsewhere distinguishes conventional drying methods from controlled air flow that preserves uniformity. Defendants also cite to a passage that, if anything, reinforces the

distinction between controlled versus uncontrolled air currents. *See* ’514 Patent at 28:52–55 (“The wet film *may* be dried using *controlled* bottom air drying or controlled microwave drying, desirably in the absence of external air currents or heat on the top (exposed) surface of the film . . . .”) (emphasis added). Further, Defendants fail to note that nine lines below this passage, the specification straightforwardly supports Plaintiffs’ position that the “conventional convection air drying from the top” criticized by the Patent involves uncontrolled air currents, not simply any kind of top air:

> “As previously mentioned *some top air flow can be used* to aid the drying of the films of the present invention, but it *must not create a condition that would cause particle movement or a rippling effect* in the film, both of which would result in non-uniformity.”

’514 Patent, 28:64–29:1 (emphases added).

**b. Defendants incorrectly assert that one may “solely employ[] conventional convection air drying from the top” despite using certain kinds of bottom heating.**

The Court should clarify that drying that involves heating from the bottom, regardless of the source of air flow, does not “solely employ[] conventional convection air drying from the top.” Defendants argue that “[t]his argument also lacks support in the intrinsic record,” simply ignoring the extensive intrinsic evidence discussed by Plaintiffs. Op. Position, *supra*; *see, e.g.*, ’514 Patent at 22:30–35 (“Examples of controlled drying processes include, *but are not limited to*, hot air impingement across the bottom substrate and bottom heating plates.”) (emphasis added). Crucially, Defendants completely ignore examples CG and CH in the ’514 Patent specification, which plainly entail bottom heating *without* bottom-sourced air flow and were extensively discussed by Plaintiffs. *See* Op. Position, *supra*. The teaching of examples CG and CH—that bottom heating may be applied without using any bottom-sourced air flow (*i.e.*, bottom

drying achieved by using air nozzles positioned at the bottom of the oven)—are simply not addressed in Defendants' answering position.

Defendants further argue that the patent "clearly disavowed conventional air drying methods which employ hot air solely from the top that heated both the top and bottom surfaces of the film." Ans. Position, *supra* (citing '514 Patent at 28:57–64). The passage cited by Defendant, however, does not state or even suggest that bottom-sourced air must be used to dry the film. Rather, the passage explains problems that might arise from solely using "[c]onventional convection air drying from the top"—namely, "initiat[ing] drying at the top uppermost portion of the film" and thereby forming "a barrier to further vapor release as the portions beneath are dried." *Id*. In other words, drying solely from the top may prevent the release of vaporized solvent as *top* heat works its way downward. This passage does not explain how bottom drying should be accomplished, much less say that bottom-sourced air must be used. *See* '514 Patent at 28:52–64. In fact, as examples CG and CH make clear, bottom drying may be performed without bottom-sourced air—*e.g.*, by using a substrate that "uniformly disperse[s] heat" in lieu of a typical wire rack. '514 Patent at 52:41–50.

In short, far from showing a "disavowal" of Plaintiffs' proposed clarification, the intrinsic evidence makes clear that it is Defendants—by reading the term as requiring bottom-sourced air flow—who are seeking to narrow not only the plain language of the '514 Patent claims, but also the language of the Court's construction. Moreover, such a reading flies in the face of the specification, which both explains the importance of avoiding drying conditions that can result in disuniformity (regardless of the direction of air flow) and provides two examples (CG and CH) which employ bottom drying by conduction in an "air oven" with no reference to bottom-sourced air flow.

**c. Defendants treat the word "conventional" in the Court's construction as a nullity and fail to address Plaintiffs' proposed definition.**

Plaintiffs ask that the Court clarify that the word "conventional" means commonly used in the field, and at the time, of the invention. Defendants state that Plaintiffs' proposed clarification "introduces uncertainty and ambiguity into the term," but do not explain why. In fact, it is Defendants' failure to articulate their own claim construction position that creates uncertainty regarding this term. For instance, Defendants state that the meaning of "conventional" is "abundantly clear," without actually stating what it is, or whether they agree with Plaintiffs' definition. Defendants also avoid taking a position on whether "conventional" refers to the drying method—as Plaintiffs argue—or the drying equipment. Under the guise of arguing that the meaning of "conventional" is obvious, Defendants are apparently trying to reserve the right to contest the definition or simply disregard the word later on.

Plaintiffs' proposed clarification is necessary to give effect to each word of the Court's construction and ensure that Defendants do not try to read the word "conventional" out of the construction entirely. Defendants might otherwise argue, as Teva has done, that *all* top-air convection drying is conventional. That position would render a key word of the Court's construction mere surplusage, would be contrary to the natural meaning of "conventional," and would contradict the patent specification. As Plaintiffs have noted, the Patent makes clear that air flow direction does not determine whether a drying method is conventional or not. *See, e.g.*, '514 Patent at 28:57–29:1 ("Conventional convection air drying from the top is not employed," but top air can be used as long as it does not "create a condition that would cause particle movement or a rippling effect in the film), 29:14–15 ("top air flow cannot break, distort, or otherwise physically disturb the surface of the composition"). Defendants, again, do not even purport to disagree with this analysis.

#### 4. Defendants' Sur-Reply Position

For reasons discussed above, Plaintiffs' re-argument of this term is improper. Plaintiffs should be collaterally estopped from seeking the same construction this Court considered and rejected. Plaintiffs do not identify any new evidence or argument that would warrant a different construction.[26] Instead, Plaintiffs' criticize Defendants' arguments—which are the very arguments that this Court set forth in the *Markman* Opinion in the Teva Litigation. Accordingly, this Court should adopt its previous construction for the reasons detailed in this Court's *Markman* Opinion in the Teva Litigation.

Furthermore, Plaintiffs should not be permitted to change this Court's construction under the guise of clarification. First, "solely employing conventional convection air drying from the top" should not be clarified to mean drying that uses uncontrolled air currents, when the specification describes conventional convection air drying from the top which employs controlled air currents (as well as uncontrolled air currents).[27] Contrary to Plaintiffs' arguments, the first passage Defendants identify in the Answering Position describes conventional convection air drying which employs "forced hot air"—*i.e.*, controlled air currents. Ans. Position at 50. And the second passage—"The wet film may be dried using controlled bottom drying or controlled microwave drying, desirably in the absence of external air currents or heat on the top (exposed) surface of the film"—reinforces the fact that conventional convection drying from the top could employ either controlled or uncontrolled air currents. *Id.* The fact that the patentee

[26] To the extent Plaintiffs argue there is purportedly "new" evidence, it was available to Plaintiffs in the prior litigation.

[27] Defendants do not deny that the specification also describes conventional air drying from the top which employs uncontrolled air currents.

did not distinguish between controlled and uncontrolled external air currents implies that both types of currents were possible with conventional convection drying from the top.

Similarly, "solely employing conventional convection air drying from the top" should not be clarified to mean that drying occurs without heating from the bottom. As detailed above, the patentee disavowed Plaintiffs' proposed construction. . The passage clearly describes conventional convection air drying from the top with no reference to a bottom heat source. Accordingly, the portion of the passage which refers to "the portions beneath are dried" can only refer to the drying process using the same heat that was generated at the top.

Finally, "solely employing conventional convection air drying from the top" need not be clarified to mean that drying technique was commonly employed in the field and at the time of the invention. First, Plaintiffs attempt to prematurely seek expert discovery as to what techniques fall within the scope of the Court's construction. Second, Plaintiffs' argument that they are trying "to give effect to each word of the Court's construction" to prevent defendants from reading out "conventional" from this Court's construction is nonsensical.[28] The Court's construction is in line with the intrinsic record, and there is no need to separately construe "conventional." In reality, Plaintiffs are merely seeking another bite at the apple—and it should be rejected.

[28] Plaintiffs once again mischaracterize Defendants' position. Defendants stated that: ***"[T]he Court's construction*** is abundantly clear". Ans. Position at 51 (emphasis added).

### E. Term 6 – "to maintain said substantially uniform distribution of said at least one active by locking-in or substantially preventing migration of said at least one active" (Claim 1 of the '497 Patent)

#### 1. Plaintiffs' Opening Position

As the Court indicated in the Teva Litigation, the primary dispute around this term is whether the phrase "locking-in or substantially preventing migration" should be limited to "dried to form a visco-elastic solid film" as the Court did in that case. C.A. 14-1541, D.I. 175 at 9–11.

"[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal." *GE Lighting Solutions, LLC*, 750 F.3d at 1309. As discussed above, the standard for finding disavowal, however, is "exacting" and "requires that the specification [or prosecution history] make[] clear that the invention does not include a particular feature." *Id*. (internal quotation marks omitted). Here, no such disavowal is present. While the Court in the Teva Litigation was correct that the specification of the '497 Patent contemplates that the film that results from the rapid evaporation step *can* be a "viscoelastic solid" ('497 Patent, 13:55–56), the specification does not *require* the formation of a viscoelastic solid. Accordingly, it is improper to limit the claims to an embodiment that results in the formation of a visco-elastic solid. *Enzo Biochem, Inc. v. Applera Corp*., 780 F.3d 1149, 1154 (Fed. Cir. 2015) ("[T]he court must stay ever vigilant to avoid reading limitations from the specification into the claim.") (citing *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005).

#### 2. Defendants' Answering Position

The Court previously construed the term "to maintain said uniform distribution of said [pharmaceutical/at least one] active by locking-in or substantially preventing migration of said [pharmaceutical/at least one] active" in the Teva Litigation. Unhappy with the Court's prior construction of the term "drying", Plaintiffs attempt to re-construe the term by reading out

"drying to form a viscoelastic solid film," from the Court's construction. The Court has already considered and ruled on Plaintiffs' proposed construction. Plaintiffs had a full and fair opportunity to litigate their proposed construction in the Teva Litigation and are thus precluded from advancing the same proposed construction here. *See Dynacore Holdings Corp.*, 243 F. Supp. 2d at 35; *Abbott Labs*, 110 F. Supp. 2d at 669-71; *TM Patents*, 72 F. Supp. 2d at 379. *But cf. KX Indus.*, 108 F. Supp. 2d at 387.

Even if the Court finds that Plaintiffs are not estopped from re-arguing the same claim construction they argued in the Teva Litigation, the Court should reject Plaintiffs' proposed construction. For the same reasons detailed in the Court's *Markman* Opinion in the Teva Litigation (C.A. 14-1451, D.I. 175 at 8-11), the Court should construe the disputed claim term to mean "maintain a distribution of [an active/a pharmaceutical active] by drying to form a viscoelastic solid film, thereby limiting its migration such that individual dosage units do not vary by more than 10% from the intended amount of the active for that dosage unit". As the Court noted, the resulting film should be described as "a visco-elastic solid," which is consistent with the language used in the '497 Patent. The specification of the '497 Patent "clearly contemplate[s] that the liquid matrix substantially solidifies and thereby gains sufficient structure at this phase, while not requiring that no liquid remain at all." C.A. 14-1451, D.I. 175 at 10; *see* '497 Patent at 8:38-401 ("Formation of a viscoelastic or a highly structured fluid phase provides additional resistive forces to particle sedimentation."). This construction is also consistent with Özkaya and the Declaration of Dr. Amiji. C.A. 14-1451, D.I. 109-3 at 221 ("[A] viscoelastic material is one that possess both fluid and solid properties."); C.A. 14-1451, D.I. 109-1 at ¶ 19 ("[A person of ordinary skill in the art] would understand that a solid film could contain water (or solvent) and could be subjected to further drying to remove water (or solvent).").

Accordingly, the Court should maintain its claim construction of "maintain a distribution of [an active/a pharmaceutical active] by drying to form a viscoelastic solid film, thereby limiting its migration such that individual dosage units do not vary by more than 10% from the intended amount of the active for that dosage unit."[29]

**3. Plaintiffs' Reply Position**

Defendants offer no response to the substance of the arguments advanced in Plaintiffs' Opening Position, and Plaintiffs therefore submit their proposed construction should be adopted for the reasons set forth in their Opening Position.

Defendants argue only that Plaintiffs are precluded from advancing the same proposed construction that the Court rejected in the *Teva* case. For the reasons discussed above, Plaintiffs are not precluded from advancing their proposed claim construction, as the *Teva* case has not reached a final decision.

**4. Defendants' Sur-Reply Position**

For reasons discussed above, Plaintiffs' re-argument of this term is improper. Plaintiffs should be collaterally estopped from seeking the same construction this Court considered and rejected. [30] Contrary to Plaintiffs' arguments, this Court did not improperly import an embodiment from the specification into claims. This Court's construction was properly based on both the intrinsic record (specification of the '497 Patent) and extrinsic record (Özkaya and the

[29] For additional support, see Memorandum Opinion (C.A. 14-1451, D.I. 175 at 8-11), Defendants' Answering Position (C.A. 14-1451, D.I. 108 at 24-26), and Defendants' Sur-Reply Position (C.A. 14-1451, D.I. 108 at 28-30) from the Teva Litigation.

[30] Contrary to Plaintiffs' baseless argument that Defendants did not offer a response to "the substance of the arguments advanced in Plaintiffs' Opening Position," Defendants adopted the Court's *Markman* Opinion and Teva's briefing in their Answering Position. Ans. Position at 60-61.

Declaration of Dr. Amiji). C.A. 14-1451, D.I. 175 at 10-11. Plaintiffs do not provide any intrinsic or extrinsic evidence refuting the formation of a visco-elastic solid when "locking-in or substantially preventing migration" of the active during the rapid evaporation step.

### F. Term 7 – "drying" (Claim 1 of the '497 Patent)

#### 1. Plaintiffs' Opening Position

In the Teva Litigation, the Court construed "drying" in Claim 1 of the '497 Patent to mean "drying without solely employing conventional convection air drying from the top." C.A. 14-1541, D.I. 175 at 17. The Court adopted this construction for substantially the same reasons as with the term "dried" in the '514 Patent—Term 5 above. *Id.* at 24. Accordingly, for the same reasons discussed above with regards to Term 5, Plaintiffs respectfully submit that the Court should revisit its previous construction and give this term its plain and ordinary meaning. In the event that the Court is not so inclined, Plaintiffs submit that the same clarification for the present construction be given as proposed for Term 5.

#### 2. Defendants' Answering Position

The Court previously construed the term "drying" in the Teva Litigation. Indeed, Plaintiffs' proposed construction was specifically considered and rejected by the Court. Defendants do not believe further construction is warranted. Plaintiffs had a full and fair opportunity to litigate their proposed construction in the Teva Litigation and are thus precluded from advancing the same proposed construction here. *See Dynacore Holdings Corp.*, 243 F. Supp. 2d at 35; *Abbott Labs*, 110 F. Supp. 2d at 669-71; *TM Patents*, 72 F. Supp. 2d at 379. *But cf. KX Indus.*, 108 F. Supp. 2d at 387.

Even if the Court finds that Plaintiffs are not estopped from re-arguing the same claim construction argued in the Teva Litigation, the Court should reject Plaintiffs' proposed construction as discussed above with regards to Term 5. For the reasons mentioned in the Court's

*Markman* Opinion in the Teva Litigation (C.A. 14-1451, D.I. 175 at 13-17), the Court should construe the disputed claim term to mean "drying without solely employing conventional convection from the top". The Court correctly noted: "[T]he patentee disavowed using solely convection air drying from the top, both through express statements of what the invention is and repeated disparagement of top drying methods." *Id.* at 15. For example, the patentee emphasized the importance of avoiding a ripple effect to maintain uniformity. '497 Patent at 3:20-22, 43-63. Furthermore, the patentee expressly disavowed using solely conventional convection air drying from the top:

> The wet film is then dried using controlled bottom drying or controlled microwave drying, desirably in the absence of external air currents or heat on the top (exposed) surface of the film **48** as described herein. Controlled bottom drying or controlled microwave drying advantageously allows for vapor release from the film without the disadvantages of the prior art. ***Conventional convection air drying from the top is not employed*** because it initiates drying at the top uppermost portion of the film, thereby forming a barrier against fluid flow, such as the evaporative vapors, and thermal flow, such as the thermal energy for drying. Such dried upper portions serve as a barrier to further vapor release as the portions beneath are dried, which results in non-uniform films.

'497 Patent at 10:58-11:3 (emphasis added); *see also* 11:4-14. Additionally, the patentee made repeated statements in the specifications detailing the advantages of bottom drying over top drying and disadvantages of using conventional convection air drying from the top. *Id.* at 6:64-7:13; 11:37-41; 12:51-54.

The patentee's "repeated derogatory statements" of conventional convection air drying from the top clearly indicate a disavowal. *Openwave*, 808 F.3d at 513-17; *Honeywell.*, 452 F.3d

at 1320. Accordingly, the Court should maintain its claim construction of "drying without solely employing conventional convection air drying from the top."[31]

### 3. Plaintiffs' Reply Position

Like the word "dried" in Term 5, the Court construed this term to mean "drying without solely employing conventional convection air drying from the top" in the *Teva* case. *See* C.A. 14-1541, D.I. 175, at 17. The Court adopted its constructions of Terms 5 and 7 for substantially the same reasons. *Id*. at 24. Defendants' briefing on Term 7 also simply repeats the flawed estoppel and disavowal arguments advanced by Defendants for Term 5. Thus, for the reasons discussed with regard to Term 5 in Plaintiffs' Opening Position, and further set forth above, Plaintiffs respectfully ask the Court to revisit its previous construction and give this term its plain and ordinary meaning. In the alternative, Plaintiffs request that the Court provide the same clarification for the present construction as they have proposed for Term 5.

### 4. Defendants' Sur-Reply Position

For reasons discussed above, Plaintiffs' re-argument of this term is improper. Plaintiffs should be collaterally estopped from seeking the same construction this Court considered and rejected. Instead, this Court should adopt its previous construction for this term for the reasons detailed in this Court's *Markman* Opinion in the Teva Litigation.

## G. Term 8 – "rapidly" (Claim 1 of the '497 Patent)

There is no longer a dispute regarding this term. The parties agree that the term "rapidly" should be accorded its plain and ordinary meaning.

---

[31] For additional support, see Memorandum Opinion (C.A. 14-1451, D.I. 175 at 13-17), Defendants' Answering Position (C.A. 14-1451, D.I. 108 at 36-42), and Defendants' Sur-Reply Position (C.A. 14-1451, D.I. 108 at 46-48) from the Teva Litigation.

Dated: November 18, 2016

Respectfully submitted,

Womble Carlyle Sandridge & Rice, LLP

*/s/Mary W. Bourke*
MaryW. Bourke (#2356)
Dana K. Severance (#4869)
Daniel M. Attaway (#5130)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
(302) 252-4320
mbourke@wcsr.com
dseverance@wcsr.com
dattaway@wcsr.com

Daniel A. Ladow
James M. Bollinger
Timothy P. Heaton
J. Magnus Essunger
Sujatha Vathyam
TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY 10022
(212) 704-6000
Daniel.ladow@troutmansanders.com
James.bollinger@troutmansanders.com
Timothy.heaton@troutmansanders.com
Magnus.essunger@troutmansanders.com
Sujatha.vathyam@troutmansanders.com

Puja P. Lea
TROUTMAN SANDERS LLP
600 Peachtree Street, NE, Suite 5200
Atlanta, GA 30308
(404) 885-3000
Puja.lea@troutmansanders.com

Jeffrey B. Elikan
Jeffrey H. Lerner
Erica N. Andersen
COVINGTON & BURLING LLP
One CityCenter
850 10th St. NW

Potter Anderson & Corroon LLP

*/s/Bindu A. Palapura*
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Tung-On Kong
David M. Hanna
WILSON SONSINI GOODRICH & ROSATI
One Market Street - Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
tkong@wsgr.com
dhanna@wsgr.com

Elham Firouzi Steiner
Nellie J. Amjadi
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real, Suite 200
San Diego, CA 92130
(858) 350-2300
esteiner@wsgr.com
namjadi@wsgr.com

*Attorneys for Defendants*
*Mylan Technologies Inc., Mylan*
*Pharmaceuticals Inc., and Mylan N.V.*

Washington, DC 20001
(202) 662-6000
jelikan@cov.com
jlerner@cov.com
eandersen@cov.com

*Attorneys for Plaintiffs Indivior Inc. and Indivior UK Limited*

James F. Hibey
Rachel M. Hofstatter
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington DC 20036
(202) 429-3000
jhibey@steptoe.com
rhofstatter@steptoe.com

Cassandra A. Adams
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3905
cadams@steptoe.com

*Attorneys for Plaintiff MonoSol Rx, LLC*

37767925